**ESTATE OF Patricia E. GILMORE, Joseph P. Gilmore, Executor, Plaintiff,**

v.

**John J. BUCKLEY, et al., Defendants.**

Civ. A. No. 80–1749–T.

United States District Court,
D. Massachusetts.

May 10, 1985.

Robert J. Owens, Robert D. City, Kieran B. Meagher, Robert J. Owens Associates, Boston, Mass., for plaintiff.

James F. Meehan, James L. Polianites, Parker, Coulter, Daley & White, Boston, Mass., for defendants Buckley and Bens.

R. Robert Popeo, Kenneth B. Schwartz, Peter A. Biagetti, Thomas R. Murtagh, Mintz, Levin, Cohn, Glovsky & Popeo, Boston, Mass., for defendants Danehy, Middlesex County, Ralph.

Joseph J. Walsh, Sloane & Walsh, Boston, Mass., for defendants Fein & Koson.

Bernard A. Dwork, Barron & Stadfeld, Boston, Mass., for defendant McLaughlin.

Roberta Thomas Brown, Administrative and Legal Counsel to the Attorney General, Boston, Mass., for defendants Koson, Fein, Gilligan, & Gaughan.

William J. Davenport, Somerville, Mass., Edward E. Kelly, Boston, Mass., for defendant Ralph.

Lee Carl Bromberg, Bromberg, Sunstein & McGregor, S. George Bromberg, Boston, Mass., for defendant Bens.

## MEMORANDUM

TAURO, District Judge.

Patricia Gilmore was murdered by Bradford Prendergast on December 20, 1979, while Prendergast was on furlough from the Billerica Jail and House of Correction ("Billerica"). Gilmore's estate has brought this civil rights action [1] against Middlesex County, the Sheriff of Middlesex County, the Middlesex County Commissioners, and the Superintendent of Billerica ("county defendants"), as well as the medical director and two assistants at Bridgewater State Hospital ("Bridgewater defendants"). The case is before the court on the parties' cross motions for summary judgment.

---

1. Plaintiff's complaint is grounded on alleged violations of state tort law and 42 U.S.C. § 1983, which provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or territory, ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

## I.

### THE FACTS

On July 2, 1979, a warrant was issued for the arrest of Bradford Prendergast based on Patricia Gilmore's complaint that Prendergast had threatened her life. Prendergast was arraigned in Stoughton District Court on July 12, 1979. He was ordered hospitalized at Bridgewater State Hospital for observation and examination to determine his competency to stand trial. Dr. Anneliese A. Pontius, a Bridgewater psychiatrist, conducted the competency evaluation and reported to the court on August 15 that Prendergast was not suffering from any major mental illness and was competent to stand trial.

Two days later, August 17, defendant Dr. Robert A. Fein, a clinical and forensic psychologist at Bridgewater, reported to the court that, based on additional information, he had concluded that Prendergast was mentally ill and that failure to hospitalize him in strict security would constitute a likelihood of serious harm to himself and others. The "additional information" was the medical record from McClean Hospital, where Prendergast had been treated (by Fein, among others) between February and April 1979. Fein concluded that "Prendergast's recent medical history indicates that he is an individual with high potential for doing serious, if not murderous, harm to at least one potential victim and to himself." He recommended that Prendergast, if found guilty, be returned to Bridgewater for further hospitalization. Fein concluded that "our opinion at the present time is that Mr. Prendergast should be committed to Bridgewater State Hospital."

On August 20, 1979, Prendergast was found guilty of making threats in violation of Mass.Gen.Laws ch. 275, § 2 and was returned to Bridgewater to aid the court in sentencing, pursuant to Mass.Gen.Laws ch. 123, § 15(e). In a note to Dr. Park Dietz, head of the forensic unit at Bridgewater, Fein requested that Dietz assign a "senior person" to do the 15(e) evaluation because Prendergast was "paranoid about me enough already." Dietz assigned defendant Dr. Dennis Koson, a forensic psychiatrist, to do the 15(e) evaluation. Dietz characterized Prendergast as a "Tarasoff case" and suggested that Koson talk to Dr. Fein for further details. Koson met with Fein, attended a conference with Fein and the district attorney, met with Prendergast twice, and reviewed his Bridgewater file which contained an abstract of his McClean record.

Koson reported to the court on September 28, 1979 that, because Prendergast refused to assent to an examination, he was unable to render the opinion requested by the court. Koson, however, went on to volunteer, "I found no evidence either from my observations at the time or from his current institutional record to suggest that he might be depressed or mentally ill." But Koson added that, based on his review of the psychiatric record, Prendergast needed ongoing psychotherapy. Koson considered the opinions and impressions contained in the McClean record to be in conflict and believed that, without an examination, it would have been unethical and irresponsible to render an opinion as to whether Prendergast was dangerous as a result of mental illness.

Prendergast was discharged from Bridgewater on September 28, 1979 and sentenced to six months incarceration at Billerica. In early November, Prendergast was granted 58 days of jail credit for part of the time he spent at Bridgewater. His institutional discharge date, therefore, was moved up to January 12, 1980.

On November 5, 1979, the Billerica prisoner classification or "contract" board reviewed the intake information on Prendergast (which did not include his Bridgewater or McClean records) and deemed him eligible for furlough. Two days later, November 7, Prendergast's application for a one-day furlough was approved for November 22. On November 19, his application for a two-day work release furlough was approved to begin December 7. Prendergast completed both furloughs without incident.

Prendergast had also applied for parole to the Middlesex County Commissioners, who sat as the county parole board. The board denied his application on December 7, based on a letter from Thomas Cavanaugh, Chief Probation Officer of the Stoughton District Court, reporting Dr. Fein's concern about Prendergast's medical history and likely dangerousness.

The parole file, including the Cavanaugh letter, was sent to Billerica. Albert Donovan, a "crisis-intervention worker" who processed Prendergast's parole application, received the file on December 17. Donovan read the Cavanaugh letter to a person whom he mistakenly thought was Prendergast's counselor. The Cavanaugh information was not brought to the attention of anyone else at Billerica.

Prendergast's institutional discharge date had been moved up to December 22, 1979, based on his receipt of additional jail credits, and his third furlough was approved for December 19–20. Prendergast was released on furlough on December 19. The next day he kidnapped and murdered Patricia Gilmore.

## II.

## THE § 1983 CLAIM

In determining whether the defendants here may be held liable under 42 U.S.C. § 1983 for Gilmore's murder, initial inquiry, as in any § 1983 case, must focus on two threshold issues: "(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981).

■ The first element raises the issue of whether there is a sufficient causal connection between defendants' acts and Gilmore's death such that the state fairly may be held responsible for it.[2] This issue is closely related to the question raised by the second element: whether the defendant officials had an affirmative constitutional duty to protect Gilmore from Prendergast. *Cf. Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928) (analyzing "proximate cause" issues in terms of scope of legal duty).

Plaintiff argues that the Due Process clause of the Fourteenth Amendment imposed a duty upon the defendants that they failed to meet. Specifically, plaintiff maintains that the county defendants failed to prevent Prendergast's release, or warn Gilmore, despite the fact that they or their subordinates knew or should have known of the danger Prendergast posed to her. These failures, plaintiff argues, deprived Gilmore of her life without due process of law. Plaintiff contends that the Bridgewater defendants also deprived Gilmore of her life without due process by failing to institute civil commitment proceedings against Prendergast when they knew or should have known that, as a result of his mental illness, a failure to hospitalize him was likely to cause serious harm to Gilmore.

In *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), the Supreme Court held that a state parole board could not be held liable under § 1983 for paroling a known sex offender who subsequently tortured and murdered a 15-year-old girl, even if the board knew that such a crime was likely to occur and even if the board owed a duty to the girl under state tort law. The Court stated:

Although the decision to release Thomas from prison was action taken by the State, the action of Thomas five months later cannot be fairly characterized as state action.

444 U.S. at 284–85, 100 S.Ct. at 558–59.

The Court left open the possibility that there might be circumstances under which

---

**2.** The "state action" requirement "avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982). In a civil rights action against a state official, the under-color-of-state-law requirement of § 1983 and the "state action" requirement of the Fourteenth Amendment are identical. *Id.* at 929, 102 S.Ct. at 2750.

a parole official could be deemed to have "deprived" someone of life by action taken in connection with the release of a prisoner. But the Court emphasized that in the circumstances of *Martinez*, "decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law." *Id.* at 285, 100 S.Ct. at 559. Those circumstances included the fact that the murder occurred five months after the release, the murderer was not an agent of the state, and the parole board was not aware that the decedent, as distinguished from the public at large, faced any special danger.

Plaintiff attempts to distinguish *Martinez* on the ground that the defendants knew or should have known that Prendergast posed a special danger to Gilmore. Indeed, courts have held that, while a state has no affirmative constitutional duty to protect the general public from criminal attack, a duty of protection may arise with respect to particular persons who have a "special relationship" with the state. *See Fox v. Custis*, 712 F.2d 84, 88 (4th Cir. 1983); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982). Such special relationships typically involve persons within state custody—for example, prisoners, *see Withers v. Levine*, 615 F.2d 158 (4th Cir.), *cert. denied*, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980), institutionalized mentally retarded, *see Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), or children placed in foster homes, *see Doe v. New York City Department of Social Services*, 649 F.2d 134 (2nd Cir. 1981). A special relationship may also be based, in part, on the state's knowledge that a particular person faces a special danger. *See, e.g., Jensen v. Conrad*, 570 F.Supp. 114 (D.S.C.1983) (social service workers' failure to investigate and protect reported victims of child abuse actionable under § 1983), *aff'd in part and dismissed in part*, 747 F.2d 185 (4th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985);[3] *Beck v. Kansas University Psychiatry Foundation*, 580 F.Supp. 527 (D.Kan.1984) (plaintiffs stated a cause of action under § 1983 against officials who released prisoner known to pose a special risk to decedents).

Notwithstanding the "special relationship" plaintiff's decedent may have had with the state, the causal connection between defendants' conduct and Gilmore's murder is even more remote than the circumstances involved in *Martinez* and, therefore, is insufficient to support § 1983 liability. In *Martinez*, the defendant parole board made the decision to release a dangerous parolee. Here, plaintiff has not sued the board that made the decision to furlough Prendergast.

█ The county defendants were high-level officials who were not personally involved in the furlough decision. Of course, supervisory officials may be held responsible for the constitutional deprivations of subordinates to which they are "deliberately indifferent."[4] But, as will be explained

3. In *Jensen,* the Fourth Circuit held that state officials have an affirmative constitutional duty to protect persons who have a special relationship with the state, but declined to decide whether reported victims of child abuse had such a special relationship. 747 F.2d at 194–195. The court found that the defendants were entitled to qualified immunity because the duty of protection was not clearly established at the time of the alleged wrongdoing. *Id.* The court, however, outlined factors that should be considered in a "special relationship" analysis. These factors include: "1) Whether the victim or the perpetrator was in legal custody at the time of the incident, or had been in legal custody prior to the incident.... 2) Whether the state has expressly stated its desire to provide affirmative protection to a particular class or specific individuals.... 3) Whether the State knew of the claimants' plight." *Id.* at 194 n. 11.

4. Deliberate indifference establishes an "affirmative link" between the conduct of the supervisor and the deprivation of the subordinate. *See Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976); *Fernandez v. Chardon,* 681 F.2d 42, 55–56 (1st Cir.1982), *aff'd,* 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983). Plaintiff argues that *Parratt v. Taylor* authorizes § 1983 liability on the basis of simple negligence. But plaintiff's argument overlooks the fact that, in *Parratt,* the Court assumed it was dealing with supervisory personnel directly involved in the alleged wrongdoing. *See* 451 U.S. at 537 n. 3, 101 S.Ct. at 1913 n. 3.

below, plaintiff has failed to produce evidence suggesting that the county defendants acted with deliberate indifference to Gilmore's rights.

## A.

### County Defendants

Assuming, arguendo, that the state has a constitutional duty to protect identifiable individuals from dangerous prisoners, and that such duty was clearly established in 1979 when Gilmore was murdered,[5] *see Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), defendant county officials may not be held liable under § 1983 unless they acted with deliberate indifference to that duty. *See supra* note 4. Defendant Middlesex County may not be held liable unless defendants' omissions amounted to a "policy" of constitutional deprivations.[6] *See Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).

■ Plaintiff maintains that the furlough program at Billerica was so deficient in light of defendants' statutory responsibilities as to amount to a policy of encouraging or acquiescing to constitutional violations. Specifically, plaintiff complains that the furlough guidelines allowed the contract board to make furlough decisions without reviewing a prisoner's psychiatric records or details of his offense. According to the plaintiff, state law requires the superintendent to secure this kind of information, and the county commissioners to ensure that the superintendent obeys the law.[7] These contentions are insufficient to support an inference of deliberate indifference or acquiescence to constitutional violations.

The furlough policy at Billerica is not suspect on its face.[8] According to the furlough guidelines, the decision to grant a furlough is based on the following considerations: offense, institutional performance, resident's ability to conduct himself responsibly while in the community, prior furlough history, past history of escapes, length of sentence, cases pending and/or warrants, judgment whether the resident can be trusted to return at the designated time and not commit any criminal acts while on furlough, the need for community reintegration, and ability to obtain an acceptable furlough sponsor.

---

5. It is difficult to say that such a duty was clearly established in 1979, since the Supreme Court in *Martinez* left the question open in 1980. *See Jensen v. Conrad,* 747 F.2d at 191–92. In any event, it is necessary to go beyond this question because defendant county of Middlesex is not entitled to qualified immunity.

6. In a suit against county policy-makers, deliberate indifference suggests a "policy" of violations, *see, e.g., Wellington v. Daniels,* 717 F.2d 932, 935–36 (4th Cir.1983), and vice-versa.

7. Mass.Gen.Laws, ch. 127, § 135 provides:

The ... superintendant ... shall furnish to the parole board all information in his possession relating to any prisoner whose case is under consideration. As each prisoner is received in the ... houses of correction, it shall be the duty of the ... superintendent ..., while the case is still recent, to cause to be obtained and filed information as complete as may be obtainable at that time with regard to such prisoner. Such information shall include a complete statement of the crime for which he is then sentenced, the circumstances of such crime, the nature of his sentence, the court in which he was sentenced, the name of the judge and district attorney, and copies of such probation reports as may have been made, as well as reports as to the prisoner's social, physical, mental and psychiatric condition and history.... When all such existing available records have been assembled, they shall be made available to the parole board so as to be readily accessible when the parole or pardon of such prisoner is being considered.

Mass.Gen.Laws ch. 126, § 11 requires the county commissioners to "cause the rules established for the management of the house of correction and for the government of the prisoners therein to be strictly observed."

8. The furlough program at Billerica was instituted in 1972 pursuant to Mass.Gen.Laws ch. 127, § 90A, which authorizes the Commissioner of Corrections or the superintendent of a county corrections facility to grant temporary releases for specified purposes under prescribed conditions. Corrections department regulations implementing the statute provide that "The facility administrator shall develop a written procedure for reviewing applications for furlough for those inmates eligible for furlough...." 103 C.M.R. § 946.05 (1978).

The guidelines do not indicate what the board should do if it lacks adequate information with regard to any of these factors. Further, the contract board was arguably negligent in granting a furlough in the absence of such information. But the vagueness of the guidelines alone hardly establishes that a policy existed of releasing dangerous prisoners, or that those who made policy were indifferent to the risks of furlough.[9] This is particularly true in light of the uncontroverted evidence presented by the defendants that the furlough program had a success rate of over 99% prior to the Prendergast incident and that Sheriff Buckley and his staff kept weekly reports on furloughs and periodically reviewed the program. Plaintiff has failed to show a pattern of failures that should have put defendants on notice of a deficiency in the furlough program, or that would suggest their acquiesence in unconstitutional conduct. *Cf. Voutour v. Vitale,* 761 F.2d 812, 820 (1st Cir.1985) (per curiam) (policy of excessive use of force cannot be inferred absent pattern of striking police violence); *Delaney v. Dias,* 415 F.Supp. 1351, 1354 (D.Mass.1976) (allegation of participation or acquiescence in constitutional deprivation necessary element of § 1983 liability for personal misfeasance).

■ Superintendent Bens' alleged failure to comply with Mass.Gen.Laws ch. 127, § 135, *see supra* note 7, is similarly insufficient to establish deliberate indifference. This provision refers to information to be gathered for parole purposes, not the furlough program. Moreover, pertinent information—including the Cavanaugh letter containing Dr. Fein's assessment of Prendergast—was assembled for the parole

board. Based on that information, the board denied Prendergast's parole application.

■ Finally, deliberate indifference may not be inferred merely from the fact that the county commissioners knew of Prendergast's danger to Gilmore, based on his parole application, and yet failed to prevent Prendergast's furlough or warn Gilmore. The commissioners were not involved in individual furlough cases, nor did they know of Prendergast's furlough application. Pursuant to established practice, the commissioners sent Prendergast's parole denial and supporting documentation to Billerica by interdepartmental mail. The information was received by a "crisis intervention worker" responsible for processing parole applications. It should have been brought to the attention of the superintendent or furlough administrator.[10] In the absence of any evidence that the commissioners knew or should have known that a breakdown in communication at Billerica was likely to occur, the commissioner's mode of transmitting the information regarding Prendergast does not suggest a conscious indifference to plaintiff's constitutional rights.

## B.

### Bridgewater Defendants

The Bridgewater defendants were more directly involved in the decision to decline to petition for Prendergast's commitment than were the county defendants in the furlough decision.[11] But the commitment decision was too far removed from the murder for the Bridgewater defendants to be fairly held responsible for it. *Cf. Beck*

---

**9.** Nor is deliberate indifference suggested by the fact that the guidelines do not require notification of potential victims about a prisoner's furlough. If a prisoner is believed to be a threat, the guidelines indicate that he should not be furloughed at all.

**10.** The furlough guidelines provide that: "Any officer or employee of the Sheriff's Department who receives any information which may affect the release of a resident already approved for a furlough shall bring such information immedi-

ately to the attention of the Master, and the furlough supervisor, or other person in charge of the House of Correction when the Master in not present at the facility."

**11.** Defendant James Gilligan, the medical director at Bridgewater, was not involved in the commitment decision, however. His liability is predicated on delinquent supervision and training.

*v. Kansas University Psychiatry Foundation,* 580 F.Supp. at 536 (complaint stated a § 1983 cause of action against officials who released prisoner, but not psychiatrists who treated him).

▆▆▆ Whatever constitutional duty prison officials may have to identifiable victims to prevent the release of dangerous prisoners, no similar duty attaches to civil commitment decisions of psychiatrists. At a minimum, no such duty was clearly established at the time of the incidents in this case, and thus the Bridgewater defendants are immune from liability for civil damages.[12] *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

▆ Under Massachusetts law, a person may not be committed to a mental health facility unless a court finds that a failure to hospitalize the person would create a likelihood of serious harm by reason of the person's mental illness. Mass.Gen.Laws Ann. ch. 123, § 8 (West Supp.1985). Section 15(e) of chapter 123, under which Prendergast was returned to Bridgewater in aid of sentencing, *authorized* the Bridgewater superintendent or medical director to petition the court for Prendergast's commitment. It is significant that the statute does not *require* the medical director to petition for commitment of dangerous, mentally ill persons; to do so might threaten their constitutionally protected liberty interests.[13]

The prediction of dangerous behavior is an uncertain, inexact science. *See Rogers v. Okin,* 478 F.Supp. 1342, 1365 (D.Mass. 1979), *aff'd in part and rev'd in part,* 634 F.2d 650 (1st Cir.1980), *vacated,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982). In furlough or parole situations, such uncertainty might reasonably be expected to be resolved in favor of the public, at the expense of the individual who has no constitutional right to early release. In the civil commitment context, however, such uncertainty should generally be resolved in favor of the individual. Imposing a constitutional obligation on state hospital officials to petition for the commitment of persons whom they "know" or "should know" are dangerous and mentally ill might shift the burden of uncertainty so as to threaten the subject of inquiry with deprivation of liberty without due process of law. *But see, e.g., Durflinger v. Artiles,* 234 Kan. 484, 673 P.2d 86 (1983) (recognizing tort action for negligent release of mental patient with violent propensities, noting that duty of care "must take into consideration the uncertainty which accompanies psychiatric analysis" [citation omitted] ). In the absence of any precedent suggesting such a duty, this court finds that the Bridgewater defendants did not deprive plaintiff's decedent of any clearly established constitutional right.

## III.

## CONCLUSION

The defendants have demonstrated that there is no genuine issue as to any material fact, and that they are entitled to summary judgment with respect to the § 1983 claims. The court declines to exercise jurisdiction over the pendent state claims.

An order will issue.

---

12. There is no question that civil commitment decisions are discretionary functions to which qualified immunity attaches.

13. The Supreme Judicial Court, in interpreting a prior statute authorizing temporary commitment, stated:

It is plain that any statute is to be strictly construed which purports to authorize a person or an officer of government to restrain for any length of time a person in the exercise of his personal liberty. So construed, § 79 requires by necessary implication that a physician, as also everyone of the officers named in § 79, shall act in good faith and without negligence whenever, acting under said section, they exercise the power conferred on them by that statute.

*Karjavainen v. Buswell,* 289 Mass. 419, 426, 194 N.E. 295 (1935). Plaintiff construes this statement as evidence of defendants' duty to protect Gilmore. The existence of such a duty under state law, however, would not in itself be sufficient to establish that defendants had a constitutional duty to protect her. *See, e.g., Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979).