**Jane DOE**

v.

**UNITED SOCIAL AND MENTAL HEALTH SERVICES, INC., et al.**

**Michael J. YEAGER, Jr., Administrator of the Estate of Theresa Ann Yeager**

v.

**Richard J. REDDINGTON, et al.**

**Civ. Nos. H-85-258. (PCD), H-85-624 (PCD).**

United States District Court, D. Connecticut.

Oct. 9, 1987.

---

Hubert J. Santos, Susan K. Smith, Buckley & Santos, Hartford, Conn., Peter Schwartz, Peter N. Upton, Tarlow, Levy, Mandell & Kostin, Farmington, Conn., for plaintiffs.

Michael Durham, William J. McGrath, Jr., John W. Lemega, Arthur E. Webster, Halloran, Sage, Phelon & Hagarty, Hartford, Conn., Stephen J. O'Neill, Peter E.

Wieses, Asst. Atty. Gen., Hartford, Conn., for defendants.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

DORSEY, District Judge.

*Facts and Procedural History*

These two cases arise from defendants' granting and supervising the parole of a convicted felon, Stephen Shields. In 1979, Shields was convicted in state court of the attempted robbery of a bank during which he shot a female teller. He was sentenced to the custody of the Connecticut Department of Corrections for seven to seventeen years. Shields has a history of psychiatric problems and drug and alcohol abuse. On June 24, 1983, a panel of the Connecticut Board of Parole granted parole and Shields was released on parole to the State of Florida. His parole conditions required that he be employed, that he remain in Florida, and that he enter a drug treatment program.

Shields violated parole almost immediately by returning to Connecticut in July 1983. On July 24th/25th, 1983, he stabbed Theresa Yeager to death in Hartford.[1] Upon learning that Shields had returned to Connecticut, his parole was revoked on October 20, 1983. Shields was returned to custody until January 9, 1984, when he was re-paroled to Brooklyn House, a halfway house in Brooklyn, Connecticut. On February 10, 1984, Shields left Brooklyn House without permission and made his way to Willimantic (a violation of his parole). Some hours later, he kidnapped Jane Doe by forcing his way into her car. Shields then drove Doe to Amherst, Massachusetts, where he sexually assaulted her and attempted to strangle her. Jane Doe is the plaintiff in Civil H–85–258. Michael J. Yeager, the plaintiff in Civil H–85–624, is the administrator of Theresa Yeager's estate.

The plaintiffs each brought actions against various state officials[2] under 42 U.S.C. § 1983, alleging that their conduct with respect to Shields deprived Yeager and Doe of due process rights protected by the constitution. Both plaintiffs have joined state tort claims against those officials and plaintiff Doe has joined the operator and two staff members of Brooklyn House in a negligence claim under state law.[3] Both plaintiffs assert that the court has pendent jurisdiction over their state law claims. Plaintiff Doe asserts diversity jurisdiction.

The state defendants have moved for summary judgment against both plaintiffs on the § 1983 claims. They also have moved that the court not exercise pendent jurisdiction over the plaintiffs' state law claims. In addition, the halfway house defendants have moved for summary judgment against plaintiff Doe on her negligence claim against them. Plaintiffs and defendants have filed extensive appendices, including numerous affidavits, deposition transcripts, and other documents for the court's consideration on these issues.

*Summary Judgment*

Before granting a motion for summary judgment, the court must determine from the materials presented by the parties

---

1. Shields plead guilty to the manslaughter of Theresa Yeager on December 16, 1986.

2. Yeager has named defendants Reddington, Chairman of the Connecticut Board of Parole; Albert, Deputy Commissioner of Field Services for the Department of Correction; Fjelman, Chief of Parole Services for the Department of Correction; and Orszak, who was Assistant Warden for Treatment at Connecticut Correctional Institution at Somers for three weeks of Shields' incarceration there. Doe has named these defendants plus defendant Morabito, Shields' Parole Officer while he was at Brooklyn House. During times relevant to the complaint, Albert was Fjelman's supervisor and Fjelman

supervised Cynthia Morse. Morse was the Department of Correction's official who carried out the Board of Parole's June 1983 directive that Shields be paroled to Florida by arranging for Shields' parole with parole officials there. Collectively, these defendants will be referred to as "state defendants."

3. Defendant United Social and Mental Health Services, Inc. operates Brooklyn House under a contract with the State Department of Correction. Defendant Boland was the Director of Brooklyn House and Defendant Zaccaro was a staffer at the House and Shields' counselor while he was there. These defendants will be referred to as the "halfway house defendants."

"that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. Pleadings and documentary evidence are to be construed liberally in favor of the party opposing summary judgment, resolving all ambiguities and drawing all reasonable inferences against the movant. *American Int'l Group, Inc. v. London American Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981).

## I. *The State Defendants*

### A. *Absolute Immunity*

As a threshold issue, the state defendants assert that they are entitled to absolute common law immunity from § 1983 claims. Defendant Reddington claims absolute immunity for his actions as a member of the state Parole Board which granted parole to Stephen Shields. The other state defendants claim absolute immunity as corrections and parole officials who supervised Shields' parole at various levels.

Although § 1983 does not admit of immunities on its face, Congress has been held not to have intended to sweep away entirely the common law tradition of official immunity. *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Absolute immunity is narrow, afforded only to those "officials whose special functions or constitutional status requires complete protection from suit." *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). For most state officials, qualified immunity is the norm. *Id.*

▮ Whether state parole board members enjoy absolute immunity has been left open by the Supreme Court. *Martinez v. California*, 444 U.S. 277, 284, 100 S.Ct. 553, 558, 62 L.Ed.2d 481 (1980). In determining § 1983 immunity, the Court has applied a functional test based on the nature of the responsibilities of the individual official. *Cleavinger v. Saxner*, 474 U.S. 193, 106 S.Ct. 496, 501, 88 L.Ed.2d 507 (1985). Applying this test to Parole Board members, the circuit courts have reached conflicting results. *See, e.g., Johnson v. Rhode Island Parole Board*, No. 86–1747 (1st Cir. Mar. 31, 1987) (extending absolute immunity); *Pope v. Chew*, 521 F.2d 400 (4th Cir.1975) (absolute immunity); *Thompson v. Burke*, 556 F.2d 231 (3d Cir.1977) (absolute immunity only for adjudicatory acts and qualified immunity for administrative acts); *Wolfel v. Sanborn*, 666 F.2d 1005 (6th Cir.1981), *vacated on other grounds*, 458 U.S. 1102, 102 S.Ct. 3476, 73 L.Ed.2d 1363 (1982) (qualified immunity); *Fowler v. Cross*, 635 F.2d 476 (5th Cir. 1981) (qualified immunity).

Reddington's actions as a member of the Board of Parole meet the functional test under the circumstances presented here. Plaintiffs' claims against Reddington are based on his actions as a member of the panels which granted Shields parole. In granting, denying or revoking parole, Parole Board officials perform tasks "functionally comparable" to those of judges. *Sellars v. Procunier*, 641 F.2d 1295, 1303 (9th Cir.1981), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 678, 70 L.Ed.2d 644 (1981). *See also Schaffer v. O'Neill*, Civ. No. H–83–250(JAC) (D.Conn. Feb. 9, 1984) (Ruling on Motion to Dismiss). The Board is a "neutral and detached" hearing body, *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972), which hears cases and makes determinations. The Board is appointed by the Governor with the "advise and consent" of either house of the General Assembly. Conn.Gen.Stat. § 54–124a. They do not investigate or prosecute in connection with parole hearings, but rely upon the parolee and the Department of Correction to supply information. *See* Plaintiff's Memorandum in Opposition to Summary Judgment, Exhibit H (Deposition of Reddington).

In exercising these functions, Parole Board officials have a duty similar to that of judges to render impartial decisions in controversies which often excite strong feelings on all sides. *See Sellars*, 641 F.2d at 1303. The threat of suits by dissatisfied prisoners or injured members of the public would infect an already difficult decision-making process with extraneous concerns personal to the individual members.

Finally, *Cleavinger*, 106 S.Ct. 496, supports the conclusion that Reddington is entitled to absolute immunity. In *Cleavinger*, while holding that members of prison disciplinary committees are not entitled to immunity, the Court distinguished such officials from Parole Board members who are "impartial professional[s] serving essentially as an arm of the sentencing judge." *Id.* at 502 (citation omitted). Therefore, Reddington is entitled to absolute immunity from § 1983 damage actions for his part in granting parole to Shields, summary judgment must be granted as to him on the plaintiffs' federal claims.

■ However, Parole Officer defendant Morabito and defendants Albert and Fjelman should not be accorded absolute immunity. Their duties are administrative and investigative, not "quasi-judicial". *See Butz v. Economu*, 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978). Supervisory functions over parolees and decisions are not made on a formal record, in an adversary process, or subject to close review or other safeguards. *Id.* None of these officers is neutral, impartial or independent in the way that judges are. They are employed by the Department of Correction and are under supervision within that Department. *See Cleavinger*, 106 S.Ct. at 502 (disciplinary committee members were employees of Bureau of Prisons and were subordinates of warden).

The connection of these defendants to the Parole Board does not extend the Board's absolute immunity to them. *See Harlow*, 457 U.S. at 810, 102 S.Ct. at 2734. They do not participate in decisions to grant, deny or revoke parole. Plaintiff's claims against Albert, Fjelman and Morabito are based on their alleged failures to supervise Shields' parole properly and to order his re-arrest at appropriate times, not on any action taken pursuant to a specific order of the Parole Board. The decision of a parole official to seek the re-taking of a parolee is more akin to that of a police officer determining probable cause than to that of the Parole Board granting or revoking parole. *Nelson v. Balazic*, 802 F.2d 1077, 1079 (8th Cir.1986); *Galvan v. Gar-*

*mon*, 710 F.2d 214 (5th Cir.1983), *cert. denied*, 466 U.S. 949, 104 S.Ct. 2150, 80 L.Ed.2d 536 (1984). Thus, as with a police officer's decision, public policy requires only qualified immunity for the parole officer's function. *See Ray v. Pickett*, 734 F.2d 370, 374 (8th Cir.1984).

### B. *Constitutional Violation*

■ The state defendants also argue that plaintiffs have not stated cognizable claims under 42 U.S.C. § 1983 because defendants did not deprive them of any right secured by the constitution. Defendants maintain that no § 1983 cause of action exists when a person in state custody injures a member of the public. Even if such a cause of action does exist, there is no genuine factual dispute as to the existence of a key element.

Under some circumstances parole officials might be deemed to have violated someone's constitutional rights by granting or inadequately supervising parole. *Martinez*, 444 U.S. at 285, 100 S.Ct. at 559. In *Martinez*, the plaintiff brought a § 1983 action against Parole Board members in connection with the parole of a prisoner who killed plaintiff's decedent after his release. The Court upheld dismissal of the action based on three factors. First, the killer was not the "agent" of the defendants; second, there was a five-month time lapse between the killer's release and the murder, which the Court called "too remote a consequence" of the defendant's actions; and third, the defendants were not aware that the decedent faced any "special danger" not faced by the public at large. *Id.* at 285, 100 S.Ct. at 285; *See Beck v. Kansas Univ. Psychiatry Foundation*, 580 F.Supp. 527 (D.Kan.1984).

Decisions following *Martinez* have held that, where the state has assumed a "special relationship" to a particular person, the state's failure to protect that person might implicate rights under the due process clause. *See, e.g., Gilmore v. Buckley*, 787 F.2d 714, 720 (1st Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986); *Fox v. Custis*, 712 F.2d 84, 88 (4th Cir.1983) (collecting cases); *P.L.C. v. Hous-*

*ing Auth. of County of Warren,* 588 F.Supp. 961 (W.D.Pa.1984). These cases have held that there must be a sufficient nexus between the harm to plaintiffs and the officials involved so that an action may properly be *imputed* to those who had the power or responsibility to prevent that action and any consequent harm. *Id.* at 962 (state action turns on proximity or remoteness of conduct to injury). A public official's mere negligence as to the danger to plaintiffs is not actionable under § 1983. *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

A "special relationship" exists where a plaintiff is in state custody, *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1979) (state may not act with indifference to the safety of prisoners); where a plaintiff is a tenant of a state housing agency, *P.L.C. v. Housing Auth.,* 588 F.Supp. 961; or where a child is in the care of state social services. *Doe v. New York City Dept. of Social Serv. (Doe II),* 709 F.2d 782 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). A "special relationship" has also been recognized where the state officials knew or should have known of a special danger posed to the plaintiff in relation to some one in their custody or control. *See, e.g., Jones v. Phyfer,* 761 F.2d 642, 645 (11th Cir.1985); *Humann v. Wilson,* 696 F.2d 783, 784 (10th Cir.1983); *Beck,* 580 F.Supp. at 534; *Jensen v. Conrad,* 570 F.Supp. 114, 131 (D.S.C.1983), *aff'd in relevant part,* 747 F.2d 185 (1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985).

Both plaintiffs' complaints allege the existence of such a special relationship between the defendants and Shields and the plaintiffs. The more difficult issues, presented by the state defendants' summary judgment motions, are: Whether there are genuine issues of material fact as to a special relationship or special danger posed by Stephen Shields to Jane Doe and/or Theresa Yeager.

### 1. *Theresa Yeager*

■ Plaintiff Yeager relies upon two sources in the record to establish that Stephen Shields posed a special danger to Theresa Yeager, of which defendants should have known.[4] First, there is evidence that Shields and Theresa Yeager grew up in the same town (Levittown, Pennsylvania). In 1984, while incarcerated in Massachusetts, Shields told a cellmate he had dated Yeager's cousin. Shields also confessed after Yeager's death that immediately after his parole in 1983, he had set out to find and kill Ms. Yeager because of a drug-related incident in Philadelphia. Yeager's Memorandum in Opposition to Summary Judgment, Exhibit A (Transcript of Shields' probable cause hearing).

However, nothing in the record suggests that while Shields was under their supervision any of the state defendants knew of Shields' relationship with Theresa Yeager. Nor is there any basis basis to find that any of these defendants knew facts from which they should have made a further inquiry and in turn should have known of that relationship. They did not receive any warning of the relationship from any source. *See Davidson,* 106 S.Ct. at 669 (note from plaintiff warning that he had been threatened by another inmate); *Doe II,* 709 F.2d at 785, 791 n. 12 (psychiatrist's opinion that plaintiff was being sexually abused by foster parent under state's supervision).

Moreover, even if it was known that Shields had a relationship with Yeager, that knowledge would not, of itself, suggest that Shields was a special danger to her.[5] So far as the record shows, Shields had never threatened Ms. Yeager before the killing, so that defendants cannot be said to have been "callously indifferent" to such threats, *Davidson,* 106 S.Ct. at 670, or

---

**4.** *See* Yeager's Memorandum in Opposition at 18–19.

**5.** Obviously, every parolee has some relationship with members of the public. Only where state officials know of a relationship which in-

cludes a high probability of danger to a third person do they have any duty to protect that person. *See, e.g., Jones v. Phyfer,* 761 F.2d 642 (plaintiff had been victim of a furloughed inmate's prior crime; no "special relationship")

even to have failed in a duty to report or investigate further. *Doe II,* 709 F.2d at 791–92 (failure to report or investigate suspected child abuse).

■ Plaintiff suggests that defendants should have known that Shields, during the time he was under their supervision, was a danger to *the public* as a whole, including Theresa Yeager. Plaintiff relies secondarily on a Connecticut statute which permits the Parole Board to grant parole only if the grant is "not incompatible with the welfare of society," Conn.Gen.Stat. § 54–125,[6] and upon the affidavit and report of Dr. Walter Borden, a forensic psychiatrist. Yeager's Memorandum in Opposition, Exhibit E. Dr. Borden examined Shields in 1978 in connection with Shields' original sentencing. His 1978 report identified Shields as "a desperate and very sick man mentally. He needs long term confinement in a closed psychiatric setting where he cannot obtain drugs and where he will not be prematurely released.... If left to his own devices, he will kill himself either slowly or quickly and may damage others along the way." *Id.*

Although such reports normally become part of an inmate's Department of Correction's file, the Borden report was not included in the Department's files on Shields, was not considered by the Board of Parole in its decisions on Shields, and was not considered by the other state defendants in making decisions with respect to him. Yeager argues that defendants should be charged with knowledge of the Borden report, which revealed Shields to be a dangerously unstable and drug-dependent individual. Yeager claims that this knowledge, combined with the statutory standard for granting or continuing parole, establishes a "special relationship" between Shields and Theresa Yeager and, consequently, creates a duty on the part of defendants to protect her.

Once a constitutional duty has been established through "special relationship," failure to perform duties specified by state statutes is evidence of the deliberate indifference to the duty required to make out a § 1983 claim. *See Jensen v. Conrad,* 570 F.Supp. at 121, 122 (discussing state statutory duties in context of child in custody of state); *Doe v. New York City Dept. of Social Serv. (Doe I),* 649 F.2d 134, 146 (2d Cir.1981). While a state statute may impose a duty on state officials which creates the "special relationship" required for a § 1983 claim, the broad wording of the Connecticut statute is not sufficient to do so.[7] The statute refers to the welfare of society as a whole; it does not impose an affirmative duty to protect a "defined class of citizens." *Gilchrist v. City of Livonia,* 599 F.Supp. 260, 264 (E.D.Mich.1984); *Doe I,* 649 F.2d at 146, *same case on appeal after remand,* 709 F.2d 782 (2d Cir.1983); *cf. Beck,* 580 F.Supp. at 534 ("best interests of society" standard for parole discussed as supporting duty to protect, where plaintiffs had already made showing of special danger). Moreover, any duty imposed by the statute is imposed on the Parole Board in making its decision to grant or deny parole. That duty does not extend to the actions of the other state defendants who supervised Shields' parole once it was granted by the Board, as they did not take part in the parole decision itself.

The facts which can be inferred from the plaintiff's materials are similar to those of *Phyfer,* 761 F.2d at 643. In *Phyfer,* a woman was raped in her apartment by a juvenile offender while he was on furlough from a state institution. The young man had been imprisoned just six months' earlier for breaking into the plaintiff's home

---

**6.** Section 54–125 provides:
Any person confined for an indeterminable sentence, ... may be allowed to go at large on parole in the discretion of the panel of the board of parole for the institution in which the person is confined, if
(1) it appears from all available information, including such reports from the commissioner of correction as such panel may require, that there is reasonable probability that such inmate will live and remain at liberty without violating the law and
(2) such release is not incompatible with the welfare of society.

**7.** This does not mean that the statute may not impose a duty upon state officials for the purposes of *state* tort law, only that it does not create a *constitutional* duty to plaintiff.

and had an extensive criminal and psychiatric history. In the face of this history, the Alabama Department of Youth Services had released him on furlough to the home of his grandmother, in close proximity to the plaintiff's home. The Court of Appeals for the Eleventh Circuit affirmed the district court's dismissal of the plaintiff's § 1983 action against the Department and its officials on the ground that no "special relationship" had been established. The plaintiff's status as a prior victim of the juvenile, and as one who had been instrumental in having him convicted, was held insufficient to create a special relationship even where the defendants had allegedly violated duties imposed by state law governing the granting of furloughs. *Id.* at 647.

A "special relationship" was found in *Gilmore v. Buckley*, 608 F.Supp. 554, 558 (D.Mass.1985), *aff'd*, 787 F.2d 714. Gilmore had been threatened by one Prendergast, who was arrested and sent to a state mental hospital for observation and examination. He was diagnosed as mentally ill with "a high potential for doing serious, if not murderous, harm to at least one potential victim." *Id.* at 556. Prendergast was convicted, but was eventually discharged from the mental hospital and sentenced to a house of correction, from which he was given three temporary furloughs, despite notification of the prior diagnosis. While on the third furlough, he kidnapped and murdered Gilmore. The estate sued various high level officials of the county who had supervised the house of correction and Prendergast's parole status. The court assumed that the decedent had a special relationship with the state, but went on to grant summary judgment for the defendants because the plaintiff had failed to produce evidence that the county defendants had acted with "deliberate indifference" to Gilmore's rights. *Id.* at 559.

Plaintiff's showing of special relationship here is clearly weaker than in either *Phyfer* or *Buckley*. There is no clear showing that the state defendants can be properly charged with knowledge of Shields' dangerousness at the time he was released on parole to Florida, but even if that knowl-

edge is assumed, there is no evidence of the existence of a "special danger" specifically to Theresa Yeager, either individually or as a member of an identified or identifiable class of which the state defendants knew or should have known.

Accordingly, the motions of the state defendants for summary judgment on Yeager's claim are granted. Of course, nothing said here affects the merits of Yeager's state law claims based on negligence theories and not subject to the limits of § 1983. However, the court declines to exercise pendent jurisdiction over the state law claims and they are dismissed. *See, e.g., Buckley*, 608 F.Supp. at 561.

### 2. Jane Doe

 To establish a "special relationship" plaintiff Doe relies primarily upon Conn. Gen.Stat. § 54–125 and on the more specific parole standards set out by the Board of Parole in its Statement of Organization and Procedures. *See* Doe's Memorandum in Opposition to Summary Judgment, Exhibit 27. Much of what has been said above regarding plaintiff Yeager's claim of special relationship based upon state law applies here.

Neither § 54–125 nor the Parole Board's Statement can be said to impose an affirmative constitutional duty to protect a "defined class of citizens." *Gilchrist*, 599 F.2d at 264. The statute and parole procedures do not single out for special protection any group of which the plaintiff is a member. They set standards to protect the public as a whole. The standards are not like statutes, which require reporting of suspected cases of child abuse. *See Doe I*, 649 F.2d at 146 (violation of statute imposing specific duty as evidence of deliberate indifference).

Further, the statute and procedures cited govern only the grant or denial of parole. That decision is made by the Parole Board itself which is an autonomous agency. The statutes and procedures cited do not set forth standards or procedures for the supervision of one such as Shields while he is on parole. The other state defendants su-

pervise the paroles once parole is granted and they do not take part in the actual decision to grant parole. Thus, the statute and procedures cited cannot create a special relationship between Doe and the non-Parole Board defendants. In addition, so far as the record shows, defendants Albert, Fjelman and Orszak had no actual or constructive knowledge of Shields' escape from Brooklyn House and no part in his placement there. It cannot be said that they knew or should have known of any "special danger" posed by Shields to plaintiff.

However, there is another potential source of a special relationship between the state and Jane Doe: the knowledge of defendant Morabito, who was Steven Shields' parole officer during his time at Brooklyn House. If, at the time Doe was kidnapped and assaulted by Shields, Morabito knew or should have known that Shields posed a special danger to plaintiff, then the special relationship requirement would be met. *See Beck*, 580 F.Supp. at 534 (defendant knew or should have known of special danger).

Several inferences, most of them uncontradicted, may be drawn from the materials in the record about the state of Morabito's knowledge. Morabito was assigned as Shields' parole officer in December 1983, shortly before Shields arrived at Brooklyn House. Morabito had access to the Borden pre-sentence psychiatric reports, and other psychiatric reports in Shields' Department of Correction's medical file, but did not review those reports. Doe's Memorandum in Opposition, Exhibit 18 at 54–55 (Morabito Deposition). He was also aware of Shields' alcohol problems and the no-drinking condition of his parole. Morabito classified Shields as requiring "maximum" supervision on the Department of Correction's scale for parolees. *Id.*

Shields was paroled to Brooklyn House on or about January 9, 1984. At about 2:45 p.m. on February 10, 1984, Shields walked off the premises at Brooklyn House without permission. Shortly after 3:00 p.m., defendant Cheryl Boland, Director of Brooklyn House, left a message for Mora-

bito to inform him of Shields' disappearance. Morabito received this message by 4:30 p.m. Later, Shields called Brooklyn House and left a phone number where he could be reached. Boland called the number and spoke to Shields who asked her to give the number to Morabito, and she did so. Morabito called Shields at the number, which he recognized as a public phone in a Willimantic exchange. He suspected from background noise that Shields was in a bar and was violating his no drinking parole stipulation, which Shields denied. Morabito told Shields that Brooklyn House would take him back if he had not been drinking or in trouble and offered to pick him up. Shields refused this offer and Morabito told him to be back at Brooklyn House by 9:30 p.m. Morabito's Deposition at 85–86.

Morabito called Boland and told her that if Shields returned under the influence of alcohol to refuse to admit him and call the state police. Shields called Boland and asked her to pick him up. Boland offered to send another male staffer alone or to come with another staffer; Shields insisted that she come alone. Boland, suspecting a "set up" and fearing for her own safety, refused. Boland's Deposition at 84. Boland then called Morabito and related this conversation with Shields. Morabito thus knew that Shields had no transportation.

Although these circumstances suggest the foreseeability of a degree of risk to one in Doe's position, a common law tort theory, these circumstances do not rise to the level of a "special danger" for § 1983 purposes. There is no evidence that Morabito knowingly exposed plaintiff to a known risk or was aware of a specific duty to protect the plaintiff. *See Doe I*, 649 F.2d at 145 (duty to investigate and report suspected child abuse). The most that can be said is that the plaintiff was driving an automobile in the same neighborhood where Shields was known to be. *Compare Irwin v. Town of Ware*, 392 Mass. 745, 467 N.E.2d 1292 (1984) (police failure to arrest intoxicated driver creates state law liability to foreseeable victim). But even if the responsibilities of Morabito's position under these circumstances created a duty to plaintiff under the common law, they are

insufficient to create the "special relationship" between the state and plaintiff which invokes the protection of the due process clause. See Phyfer, 761 F.2d at 646–47 (discussing foreseeability and special relationship requirement).

The special relationship requirement has been stringently applied to § 1983 suits in this context because not every common law tort is to be deemed a violation of a constitutional right. The facts presented here are not as striking as those upon which the requirement has been found lacking. For example, Doe had had no prior contact with either Shields or the defendants. See Buckley, 787 F.2d at 721–22 (declining to find special relationship despite evidence that some defendants were aware that assailant had threatened plaintiff); Phyfer, 761 F.2d at 646–47 (no special relationship where plaintiff was victim of furloughed assailant's prior crime). There is nothing in any of Shields' psychiatric or prison records which would have identified him as either a threat specifically to Doe, to women in Doe's circumstances, or even to women in general. Dr. Borden did not diagnose him as a killer or rapist. Though he had manifested definitive anti-social tendencies, there was nothing to suggest that he was likely to act as he came to act in relation to Doe. Compare Martinez, 444 U.S. at 279–80, 100 S.Ct. at 556–57 ("clear and present danger" allegedly created by reckless parole of sex offender; no special danger); Fox, 712 F.2d at 86 (no "special danger" where defendant parole officials did not revoke parole despite knowledge that assailant had violated parole and suspected that he had committed arson-murder). Nor had Shields himself made any such threat. See Gilchrist, 599 F.Supp. 260, 263.

Doe's argument is based upon defendants' asserted knowledge of a general danger to persons in proximity to Shields at the time of his escape. The court is aware of only one case which has extended the concept of special danger to include victims in a foreseeably specific location. See

Beck, 580 F.Supp. 527, 543. There a "special danger" to plaintiffs was found as the defendants knew or should have known that the assailant posed a special danger to individuals "who might at any given time be present at the Kansas University Medical Center," where the plaintiffs worked. Id. However, insofar as the Beck court relied upon § 319 of the Restatement (2d) of Torts to expand the concept of special danger, its discussion of that issue is not persuasive.[8]

Because there is no genuine issue of fact as to a special relationship between Doe and the state defendants, summary judgment is granted in favor of the defendants on the plaintiff's § 1983 claims.

Contrary to the state defendants' brief, Defendants' Memorandum in Support of Motion to Dismiss at 33, Doe's state law negligence claims are not subject to dismissal because she has properly invoked the court's diversity, and not merely its pendent, jurisdiction. She clearly alleges, without contradiction, that she is a resident of Colorado. Doe's Amended Complaint ¶ 5. The motion to dismiss the state law claims is denied.

## II. The Halfway House Defendants

■ The halfway house defendants have moved for summary judgment on Doe's negligence claims against them on the ground that, as a matter of law, they owed no legal duty of care to the plaintiff. Defendants argue that, because there was no special relationship between them and plaintiff as an "identifiable victim," they owed her no duty of care. See Memorandum in Support of Summary Judgment at 4. However, that is an overly restrictive reading of the common law of negligence in this context, and the motion will be denied.

Defendant United Social and Mental Health Services, Inc. operates Brooklyn House under contract with the Department

---

**8.** The Supreme Court has consistently rejected attempts to convert tort law duties into § 1983 liability for constitutional violations. See Martinez, 444 U.S. at 285, 100 S.Ct. at 559; Daniels v.

Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); see also Buckley, 787 F.2d at 722 (development of state tort law best left to state courts and legislatures).

of Correction. Defendant Boland is Director of Brooklyn House and defendant Zaccaro is a staffer at the House. Doe contends that the halfway house defendants were negligent in accepting Shields to Brooklyn House when he did not meet their own admissions criteria; in failing to follow Department of Correction procedures for supervision of Shields, contained in the its Policy and Procedures Manual for Contracted Agencies; and in negligently allowing Shields to remain free in Willimantic, thereby creating a foreseeable risk to plaintiff.

The question of liability of a halfway house for negligently accepting, supervising, and allowing the escape of a parolee in one of first impression in Connecticut. The court must do its best "in estimating what the state court would rule to be its law." *Holt v. Seversky Electronatom Corp.*, 452 F.2d 31, 34 (2d Cir.1971). The common law has long imposed a duty to prevent foreseeable harm upon those who have custody or control of persons with dangerous propensities. *See, e.g.,* W. Prosser & W. Keeton, *Torts* at 383 (5th Ed.1984); Restatement (2d) Torts, §§ 315, 319.[9]

Connecticut has recognized liability of this nature in the context of a parent's control of children. *Huangs v. Gordon,* No. 232611, 6 Conn.L.Trib. No. 29 at 17 (Sup.Ct. for Jud.Dist. of New Haven, April 22, 1980). In *Gordon,* Judge Hendel relied upon § 316 of the Restatement (2d) of Torts, which like § 319 enunciates a specific instance of the general liability principle of Restatement § 315.

Defendants, citing *Thompson v. County of Alameda,* 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980), and *Tarasoff v. Regents of Univ. of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), argue custodians of a dangerous person have a duty only to victims who are not only foreseeable but "specifically identifiable." *See Thompson,* 614 P.2d at 734. The *Gordon* court did not apply so strict a test in an analogous situation, denying a motion to strike a complaint based on the rape and assault of the plaintiff by the defendant's child of known dangerous and violent propensities. Judge Hendel stated, "[W]hile the liability of a parent for a child's torts is said to depend upon notice of a specific type of conduct, 'this need not be precise; knowledge of a tendency to attack others is enough.' [quoting Prosser, *Law of Torts,* at 873 n. 53 (4th ed. 1971)]." *Gordon,* 6 Conn.L.Trib. No. 29 at 17. Although not dispositive here, this statement is at least evidence that a Connecticut court would not require more than the ordinary tort showing of foreseeability to impose a duty of care on the defendants.

In *Sesito v. Gordon,* 178 Conn. 520, 423 A.2d 165 (1979), the plaintiff sued a municipality under Conn.Gen.Stat. § 7–465[10] and

---

9. Restatement (2d) Torts (1965):

§ 315. General Principle

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

§ 319. Duty of Those in Charge of Person Having Dangerous Propensities

One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

10. Section 7–465, Conn.Gen.Stat., as quoted in *Sestito v. Gordon,* 178 Conn. at 526–27 n. 3, 423 A.2d 165, read in relevant part:

(a) Any town, city or borough, notwithstanding any inconsistent provision of law, general, special or local, shall pay on behalf of any employee of such municipality, except firemen covered under the provisions of section 7–308, all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights or for physical damages to person or property, except as hereinafter set forth, if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, physical injury or damage was not

§ 7–108,[11] claiming liability for a police officer's failure to suppress a riot which caused injury to the plaintiff. Ordering a new trial after the trial court had directed a verdict for the town, the court held that the question of the town's liability should have gone to the jury. Noting that § 7–465 would remove sovereign immunity only if "the official involved owe[d] a duty to the individual plaintiff, not just to the public in general," the court went on to state that the breach of an individual duty was

> a personal liability requirement that calls for an inquiry into the factual matter of individual negligence. The question in each case is whether the facts present a situation where the statute applies, that is, whether a public official's constant general duty to the public has, in addition, subsumed a specific duty to the individual claiming injury. 2 Cooley [*Torts*, § 300 (4th ed.)] *It is this factual inquiry that should be left for jury determination, whether the alleged duty to the individual arises from other statutes, regulations, or the common law.*

178 Conn. at 527–28 (emphasis added). Though public officials have specific law enforcement duties, they are not to be held liable to members of the public for every abhorrent act of individuals who act in disregard of the law and in a manner which injures another. Yet, if the general duties of a public official are brought to focus on circumstances in which a particular citizen or class of citizens are foreseeably subject to real risk of injury at the hands of one who is within the realm of the officer's duties and whose conduct may properly and reasonably be the subject of the officer's discharge of his duties, then the officer's duties to the public at large can legitimately be said to have created a duty to an individual citizen. *See Cimino v. Yale Univ.*, 638 F.Supp. 952, 960–61 (D.Conn. 1986). Like the plaintiff in *Sestito*, Doe does not rely merely on a general duty owed by the halfway house to the public. *Cf. Shore v. Stonington*, 187 Conn. 147, 152–53, 444 A.2d 1379 (1982). In *Sestito*, a duty arose from a state statute which specifically enjoined police officers to suppress riotous assemblies. *See Shore*, 187 Conn. at 154–55, 444 A.2d 1379; *Cimino*, 638 F.Supp. at 961. In this case, a duty was imposed by the common law upon those holding custody of Shields, a person of known dangerous propensities. Under the principles of § 316 of the Restatement (2d), the defendants had a clear and unequivocal duty to prevent harm to those foreseeably subject to risk of injury from Shields. *Cf. id.* at 961 (common law duty upon city which "transcends its general duty to the public and becomes a specific duty" to plaintiff).

The assumption of this custodial duty by defendants thus distinguishes this case from those where defendants' actions involve the exercise of discretion. *See Shore*, 187 Conn. at 153, 444 A.2d 1379 (failure to take intoxicated driver into custody within discretion of officer). Defendants did not have discretion to release Shields or to allow him to violate the conditions of his parole by drinking. There is sufficient evidence to warrant the conclusion that whether the defendants owed a common law duty to Jane Doe under the precise circumstances of Shields' escape is a question for the jury to decide and, therefore, not resolvable on a motion for summary judgment. *See Cimino*, 638 F.Supp. 952.

Defendants here knew that Shields had left the halfway house without permission, had reason to suspect that he was violating

---

the result of any wilful or wanton act of such employee in the discharge of such duty.

**11.** Section 7–108, Conn.Gen.Stat., as quoted in *Sestito v. Gordon*, 178 Conn. at 524 n. 2, 423 A.2d 165, read in relevant part:

> Each city and borough shall be liable for all injuries to person or property, including injuries causing death, when such injuries are caused by an act of violence of any person or persons while a member of, or acting in concert with, any mob, riotous assembly or assembly of persons engaged in disturbing the public peace, if such city or borough, or the police or other proper authorities thereof, have not exercised reasonable care or diligence in the prevention or suppression of such mob, riotous assembly or assembly engaged in disturbing the public peace.

his parole by drinking and, through access to psychological reports, that he was potentially dangerous to others and in need of treatment.[12] Shields had been convicted of a serious crime involving the shooting of a woman, in which his intoxication was a factor, and he had twice stated to staff members that if he ever went back to jail, it would be "for a crime in which he went all the way." Doe's Memorandum in Opposition at 65, Exhibit 20 (Zaccaro Deposition). In their acceptance and supervision of Shields, the halfway house at least arguably violated state standards imposed upon them by the Department of Correction Policy and Procedures Manual for Contracted Agencies, Doe's Memorandum in Opposition, Exhibit 30, and its own Program Criteria established pursuant to the state policy manual. Doe's Memorandum in Opposition (Supplemental Appendix), Exhibit B. In particular, Shields was admitted to the program despite his primary alcohol problem, *see* Exhibit B at I(b); and he was not referred for psychiatric evaluation or substance abuse treatment. Policy & Procedures Manual, Exhibit 30 at 40.

When plaintiff was attacked, defendants knew that Shields was in Willimantic, fifteen miles away, without transportation to the halfway house. Boland suspected that he had hitchhiked there. Boland's Deposition at 69. Out of concern that she was being "set up" by Shields, Boland refused to pick him up herself without another staffer present. *Id.* at 84. Thus, she manifested a belief that he was a threat, at least to her and perhaps to others. Shields was ordered to return to Brooklyn House by 9:30 p.m. or face arrest, arguably a failure to act by those responsible for his custody so as to bring him back into custody immediately. Very soon thereafter, he kidnapped plaintiff. Under these circumstances, it cannot be said that, as a matter of law, Doe was not placed at foreseeable risk of injury from Shields such that the defendants owed her a duty of care.

Defendants' motions for summary judgment are denied.

SO ORDERED.

---

**12.** Boland reviewed Shields' pre-sentence investigation report which referred to "serious emotional difficulties" and to an attached psychological report by Dr. Borden. *See* Doe's Memorandum in Opposition, Exhibit 1. Borden's report was omitted from Shields' Department of Correction's files, but defendants had made no effort to seek it out, to have Shields evaluated by another doctor, or review Shields' medical file which contained his record of psychiatric treatment at Somers, including at least one suicide attempt. *See* Exhibits 8, 29.