Adela T. BAILOR and Darryl Bailor,
Plaintiffs–Appellants,

v.

SALVATION ARMY and United States
of America, Defendants–Appellees.

No. 94–2660.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1994.

Decided April 3, 1995.

Robert O. Vegeler, Beers, Mallers, Backs & Salin, Fort Wayne, IN, Timothy J. Kennedy (argued), Miller, Muller, Mendelson & Kennedy, Indianapolis, IN, for plaintiffs-appellants.

John R. Wilks (argued), Thomas L. Wooding, Wilks & Kimbrough, Fort Wayne, IN, for Salvation Army, Inc.

Deborah M. Leonard, Office of the U.S. Atty., Fort Wayne, IN, William G. Cole (argued), Dept. of Justice, Civil Div., Appellate Section, Washington, DC, for U.S.

Before BAUER, REAVLEY * and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Adela Bailor was assaulted brutally and raped by William Holly on May 9, 1991, while Ms. Bailor was working as an administrative assistant at the Fort Wayne office of Prison Fellowship Ministries. At the time of the rape, Holly was serving the final six months of his prison sentence at a Salvation Army "halfway house" in Chicago. Ms. Bailor sued the Salvation Army on the basis of common law negligence and later amended her complaint to bring an action against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346. The district court granted the Salvation Army's motion for summary judgment and granted the Government's motion to dismiss for lack of jurisdiction. For the reasons stated below, we affirm.

I

BACKGROUND

A. *Facts*

William Holly, a convicted felon,[1] violated the conditions of his work release from pris-

---

* The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, is sitting by designation.

1. Beginning with his juvenile record, Mr. Holly's life is replete with incidents of legal trouble. Before age eighteen, Mr. Holly was charged with threatening his mother with a razor blade (later dismissed); larceny (receiving a suspended sentence), and possession of a concealed weapon (dismissed). A local juvenile court described Mr. Holly at age fourteen as being in a "state of anxiety and extreme tension" due to his "awareness to [sic] very hostile almost sadistic impulses." Appellee Br. for the United States, Supp. App. at 9.

   Prior to 1969, Mr. Holly, as an adult, was arrested for threatening his mother, two charges of assault against his wife, rape (in which he was charged with night prowling and given a six-month surety bond for the offense), forging prescriptions, writing bad checks, and vagrancy.

   In 1975, Mr. Holly was involved in an armed bank robbery in South Carolina, and was ultimately sentenced in 1976 to eighteen-years of imprisonment at the U.S. Penitentiary in Terre Haute, Indiana. Mr. Holly was released on parole in Virginia in 1982, and his parole was subsequently revoked in 1985 after he was charged with attempted robbery, brandishing a pistol, and carrying a concealed weapon. Mr.

on in December 1988 when he left Fort Wayne, Indiana and travelled to Indianapolis for a weekend.[2] Federal marshals were notified, and Holly was picked up and arrested December 12, 1988 on an escape charge for which he later received a twenty-four-month sentence.

The Bureau of Prisons sent Holly to the Metropolitan Correctional Center ("MCC"), a secure facility for federal inmates in Chicago, to serve his term.[3] After Holly had served some time at the Correctional Center, he completed an application for transfer to a community corrections center, a halfway house in which federal inmates can spend the last six months of their sentence. These halfway houses are designed to ease the transition for inmates from prison to society.

In December 1990, a Bureau of Prisons group recommended that Holly be transferred to the Salvation Army facility. The group expressed concern over Holly's placement because of a prior conviction for bank robbery. However, the acting warden of the Correctional Center approved the application after reviewing Holly's file and learning that the warden had previously discussed Holly's placement and had expressed an intent to approve the transfer. The file included sentence monitoring reports, progress reports, a FBI record sheet, and the U.S. Probation Department's pre-sentence report prepared in connection with Holly's escape charge.

The entire referral packet was reviewed by the intake officer at the Salvation Army facility. The Salvation Army has the right to reject applicants, but, generally, individuals with a history of "excessive violence" consti-

tute the only rejections.[4] Additional information from the Bureau of Prisons was requested, but none was made available. With the exception of a 1966 rape charge, Holly's history was deemed unremarkable, and his transfer was approved. On January 21, 1991, Holly was transferred to the Salvation Army facility.

At the Salvation Army facility, as in other community correction centers, Holly was free to leave the facility as long as he returned by 11:00 p.m., participated in a counseling program, and submitted to random drug testing. In April, Holly's drug test revealed traces of cocaine. The Salvation Army personnel had two options upon the failure of a drug test. They could draft an incident report, give Holly a copy, and proceed to a disciplinary hearing. Holly would be able to remain at the facility until the resolution of such a proceeding. In the alternative, if the personnel believed Holly presented a risk of harm to himself or other residents, or was a potential escapee, the personnel could request, without any notice or hearing, that the United States Marshals Service immediately detain him. The Salvation Army personnel believed Holly did not present an immediate risk and informed him on May 6, 1991 about the disciplinary violation. Approximately eight minutes later, Holly left the facility after being warned by the Salvation Army shift manager about the consequences of such an action. At the time, Holly stated, "I'm out of here. I'm not going back to no MCC."

The Bureau of Prisons was immediately notified of Holly's escape. The Bureau in

Holly was released and placed in a work release program in Fort Wayne, Indiana in October of 1988.

2. Mr. Holly received assistance from the Prison Fellowship Ministries while in Fort Wayne based on a recommendation of the Terre Haute Prison chaplain. Ken Jackson, head of the Ministries in Fort Wayne, approved of such help without independent inquiry of Mr. Holly's past history. During the course of the assistance, Mr. Jackson helped Holly move into his own apartment from the work release center, provided financial assistance on occasion, and helped Mr. Holly procure furniture, a car, and a job close in proximity to the Ministries offices.

One employee at the Ministries, Sara Roberts, stated in her deposition that Mr. Holly routinely

made unscheduled visits to their offices, and would make unwelcome and inappropriate flirtatious comments or gestures to her.

3. During his incarceration, Mr. Holly corresponded with some of the Prison Fellowship Ministries employees in Fort Wayne. Ms. Roberts, in her deposition, stated the correspondence was primarily romantic. Mr. Holly expressed in his letter that he intended to return to Fort Wayne and to receive further assistance from the Ministries after his release.

4. *E.g.* child molesters, rapists or arsonists with psychological problems. R.84, Hall Dep. at 17.

turn notified the federal marshals for the Northern District of Illinois. Two days later, Holly contacted Ken Jackson of the Prison Fellowship Ministries in Fort Wayne for assistance. Holly informed him that he was released and was coming for assistance. Mr. Jackson asked Holly to telephone him when he arrived into town.

On May 9, 1991, Holly called Jackson's office numerous times. Jackson and his staff, with the exception of Adela Bailor, were not present in the office. Holly ultimately arrived at the offices in the afternoon; he was told by Ms. Bailor that he could wait for Mr. Jackson. Holly became increasingly agitated and hostile. He eventually raped and beat Ms. Bailor.

### B. District Court Proceedings

On May 6, 1993, the Bailors filed their complaint against the Salvation Army, the Prison Fellowship Ministries, and Ken Jackson. They alleged common law negligence against the Salvation Army, and common law intentional tort and § 1983 claims against Mr. Jackson and the Prison Fellowship Ministries. Jurisdiction was based on diversity of citizenship. In November 1993, the Bailors filed an amended complaint, adding the United States pursuant to the Federal Tort Claims Act.

In June 1994, the district court issued its judgment. The court granted the summary judgment motions of the Salvation Army, Jackson, and the Prison Fellowship Ministries. It also granted the United States' motion to dismiss for lack of jurisdiction. The Bailors appeal only the judgments in favor of the Salvation Army and the United States.

### II

### ANALYSIS

### A. The Salvation Army

■ Our examination of the district court's decision to grant summary judgment to the Salvation Army is governed by the de novo standard of review. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The rec-

ord must be viewed, and inferences must be drawn, in the light most favorable to the nonmoving party. *Schultz v. General Elec. Capital Corp.,* 37 F.3d 329, 333 (7th Cir. 1994). The judgment will be affirmed if there exists no genuine issue of material fact and if judgment for the Salvation Army is proper as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

■ As a preliminary matter, we note that, because Holly attacked Ms. Bailor in Indiana, the substantive law of Indiana should be applied to this case. *Maroon v. State, Dep't of Mental Health,* 411 N.E.2d 404, 409 (Ind.Ct.App.1980); *see In re Estate of Bruck,* 632 N.E.2d 745, 747 (Ind.Ct.App. 1994) (citing *Hubbard Mfg. Co. v. Greeson,* 515 N.E.2d 1071 (Ind.1987)). In any event, both Ms. Bailor and the Salvation Army agree that Indiana law should be applied in this case. Under Indiana law, Ms. Bailor must establish three elements to allege a negligence claim: (1) a duty of the Salvation Army to conform conduct to a standard of care arising from its relationship with Ms. Bailor; (2) a failure of the Salvation Army to conform conduct to the requisite standard of care arising from the relationship; and (3) a showing that Ms. Bailor's attack was proximately caused by the Salvation Army's failure to conform to the standard of care. *See Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind. 1991).

■ The first element, whether the Salvation Army owed Ms. Bailor a duty, is a question of law which we determine de novo. *Sports, Inc. v. Gilbert,* 431 N.E.2d 534, 535 (Ind.Ct.App.1982) (citing *Neal v. Home Builders, Inc.,* 232 Ind. 160, 111 N.E.2d 280 (1953)). Three factors should be considered in determining whether a duty existed: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. *Webb v. Jarvis,* 575 N.E.2d at 995 (Ind.1991).

1. The Relationship between Ms. Bailor and the Salvation Army

■ Absent privity deriving from a special consensual relationship between Ms. Bailor

and the Salvation Army, there must exist another independent basis to impose a duty of care on the Salvation Army. "When addressing the duty to control the conduct of others, the courts of Indiana generally follow the principles set forth in the Restatement (Second) of the Law of Torts." *Cole v. Indiana Dep't of Correction*, 616 N.E.2d 44, 46 n. 1 (Ind.Ct.App.1993). The general rule is set forth in § 315. That section provides in relevant part:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relationship exists between the actor and the other which gives to the other a right of protection.

Section 319 elaborates on these general criteria in the context before us today. That section, entitled "Duty of Those in Charge of Person Having Dangerous Propensities," provides:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

To establish the special relationship needed to impose a duty, Ms. Bailor must establish that the Salvation Army took "charge of a third person." Indiana law does not delineate in comprehensive fashion what is required to conclude that an entity has taken charge of an individual. Nor are there any Indiana cases directly on point as to whether a private halfway house, providing transitional services to pre-release inmates, meets the criteria for liability under § 319 of the Restatement.[5] However, in *Estate of Mathes v. Ireland*, 419 N.E.2d 782, 784 (Ind.Ct.App. 1981), the court held that under § 319, "[f]or the duty to exist there must therefore not only be an actual taking charge of the third person, there must also be a knowledge of the likelihood that he will cause bodily harm." Further, in *Sports, Inc.*, 431 N.E.2d at 538, the appellate court added that the entity taking charge must possess "the right to intervene or control the actions of a third person." Thus, Ms. Bailor must demonstrate that the Salvation Army had the legal right to control Holly, did actually control Holly, and had knowledge of his propensity for violence. In order to make this determination, we must examine the relationship between the Salvation Army halfway house and the Department of Corrections (Bureau of Prisons).

Although Holly clearly resided at the Salvation Army facility, he remained under the legal custody of the Attorney General and the Bureau of Prisons.[6] The Salvation

5. There are cases from other jurisdictions that consider the relationship of halfway houses to § 319 of the Restatement. *See, e.g., Doe v. United Social & Mental Health Servs., Inc.*, 670 F.Supp. 1121, 1132 (D.Conn.1987) (holding that the record contained sufficient evidence as to the nature of the halfway house's responsibility to justify allowing a jury to decide if a duty was owed the plaintiff, and to deny the defendant's motion for summary judgment); *Erickson v. Curtis Investment Co.*, 432 N.W.2d 199, 203 (Minn. Ct.App.1988) (holding there was no evidence that the halfway house had any ability to control the parolee who attacked a woman in a parking garage, and therefore no duty was owed to the victim), *aff'd on other grounds*, 447 N.W.2d 165 (Minn.1989); *King v. Durham County Mental Health Developmental Disabilities & Substance Abuse Auth.*, 113 N.C.App. 341, 439 S.E.2d 771, 775 (1994) (finding that a halfway house could not mandate a juvenile's return to its facility absent a court order, and therefore did not pos-

sess the right or ability to control him and could not be held liable for the murder the juvenile committed after he left in violation of the facility's rules); *Dudley v. Offender Aid & Restoration, Inc.*, 241 Va. 270, 401 S.E.2d 878, 881 (1991) (holding that a halfway house under contract to the state government "was required to maintain stringent security measures and sign-out procedures, and to report to the Department of Corrections any unauthorized absence of an inmate in excess of two hours," and therefore the custodial duties of the halfway house met the "take charge" criterion of § 319); *Noonan v. State*, 53 Wash.App. 558, 769 P.2d 313, 317–18 (1989) (holding that where a facility is not on notice that an individual may be dangerous, no duty exists to victim).

6. *See United States v. Jones*, 569 F.2d 499 (9th Cir.), *cert. denied*, 436 U.S. 908, 98 S.Ct. 2243, 56 L.Ed.2d 407 (1978); *United States v. Taylor*, 485 F.2d 1077 (D.C.Cir.1973); *Perez–Calo v. United States*, 757 F.Supp. 1 (D.P.R.1991).

Army's ability or right to control Holly was limited. The contract that defined the parameters of the Salvation Army's responsibilities allowed minimal discretion to the Salvation Army. The Salvation Army personnel were not authorized to possess lethal weapons while on duty; the personnel could not use physical force to restrain a resident except "in instances of justifiable self-defense, prevention of loss or damage to property or person, or the prevention of self-inflicted harm, and only to the degree necessary." R.101, Ex. B at 3. The Salvation Army also had limited independent disciplinary discretion, and could impose sanctions on residents only for the most minor of prohibited acts. Any serious sanctions required approval of a Bureau of Prisons representative.

Under its arrangement with the government, the Salvation Army facility, as a halfway house, could not detain a resident. Residents were free to leave, provided they signed a sign-out sheet. The facility could not be "locked down" in order to prevent residents from leaving, and individual rooms could be locked only by the residents themselves from the inside. In sum, residents could leave the facility at any time, subject only to the consequences that could be imposed by the courts or by the Bureau of Prisons. Once Holly left the facility, the Salvation Army could only report the incident to the Bureau of Prisons.

The district court's determination that "the Salvation Army had the responsibility to house Holly in a safe, clean and nurturing environment; but virtually no say-so as to effectuating meaningful control over him"[7] supports the conclusion that the Salvation Army did not possess sufficient control over Holly to create a duty to Ms. Bailor as a matter of law. The limitations on the authority of the halfway house are important and we believe a controlling factor in the relationship between the Salvation Army and Ms. Bailor. The Salvation Army had but limited authority to restrict the activity of Holly and, therefore no realistic opportunity to control Holly's activities with respect to Ms. Bailor.

### 2. Foreseeability

The second factor to consider under Indiana law in determining the question of legal duty is whether the plaintiff was a foreseeable victim injured by a foreseeable harm. *Webb v. Jarvis,* 575 N.E.2d at 996–97. The courts of Indiana have held that "the duty of reasonable care is not, of course, owed to the world at large, but rather to those who might reasonably be foreseen as being subject to injury by the breach of the duty." *Id.* at 997. "We examine what forces and human conduct should have appeared likely to come on the scene and we weigh the dangers likely to flow from the challenged conduct in light of those forces and conduct." *Id.* The question of foreseeability is a matter of law. *Fawley v. Martin's Supermarkets, Inc.,* 618 N.E.2d 10 (Ind.Ct.App.1993).

Although the courts of Indiana have not had the opportunity to address this factor in the context of a halfway house, we believe that their reliance on the Restatement as a general guide, coupled with the application of those principles in other jurisdictions, can guide our estimation as to how Indiana would resolve the matter if this case were presented to its Supreme Court today. Restatement (Second) § 281(b) states that an actor is liable for the invasion of the interest of another if

> the conduct of the actor is negligent with respect to the other, or the class of persons within which he is included....

The commentary accompanying this provision expands upon the text:

> In order for the actor to be negligent with respect to the other, his conduct must create a recognizable risk of harm to the other individually, or to a class of persons—as, for example, all persons within a given area of danger—of which the other is a member.

Restatement (Second) of Torts § 281(b) cmt. c. The Supreme Court of Virginia confronted the application of this provision in the context of a halfway house in *Dudley v. Offender Aid & Restoration of Richmond, Inc.,* 241 Va. 270, 401 S.E.2d 878 (1991). The court concluded that when a person who has

7. *Bailor v. Salvation Army,* 854 F.Supp. 1341, 1361 (N.D.Ind.1994).

charge of a dangerous person is negligent and the person escapes, the duty is to

an entire class of prospective victims: those who are directly and foreseeably exposed to the risk of bodily harm as a result of the defendant's failure to control his dangerous charge. Frequently, the circumstances will be such as to include within the class 'all persons within a given area of danger,' in the words of the comment on Restatement § 281(b).

*Dudley,* 401 S.E.2d at 883. The court then applied this principle to the context of a halfway house:

If a prisoner escapes, penniless and on foot in a remote, unpopulated area, and is soon recaptured, the class of potential victims foreseeably at risk during the time of his escape may be very small indeed. By contrast, if a dangerous prisoner is allowed, by a defendant's negligence, to run at large in a city throughout the night time hours, the class of potential victims at risk may extend to all who are present within the area to which the prisoner will foreseeably have access during the period of his freedom.

*Id.* Applying these principles to the case before it, the Virginia court reasoned that the liability of the negligent halfway house ought to extend to the entire city in which the halfway house was located.

In this case, Holly's attack on Ms. Bailor took place three days after he had walked out of the halfway house in a city approximately 150 miles away. The halfway house's arrangement with the United States Marshals Service clearly vested responsibility for the whereabouts of Holly on the government, not on the halfway house that had neither the information gathering capabilities nor the investigative resources to deal with the danger that Holly might pose at such a time and distance.

### 3. Public Policy Concerns

In determining the existence of a duty, the final factor that Indiana courts weigh is public policy concerns. There is no doubt an important rehabilitative interest in assisting federal inmates in their transition to "self-sufficient, contributing members of the community." R.101, Ex. B at 1. There is also, however, an extraordinarily important interest in protecting the members of the public from brutal assaults at the hands of those still serving a sentence to incarceration. We believe that, given the importance of both of these factors, the Indiana courts would decline to give determinative weight to either and would define the duty of care assumed by the halfway house as circumscribed by the first two factors of the analysis. The duty of the halfway house ought to be defined in terms of its authority to restrain the prisoner and the foreseeability of the risk, considered both temporally and spatially.

We believe that the district court correctly determined that the halfway house owed, under the law of Indiana, no duty in tort to Ms. Bailor. We therefore need not consider Ms. Bailor's further contentions: Whether the Salvation Army exercised reasonable care in dealing with Holly, and whether the Salvation Army proximately caused Ms. Bailor's injuries.

### B. *The United States*

#### 1. The Discretionary Function Exception

■ A federal court may exercise subject matter jurisdiction over an action in tort against the United States only if the United States has waived its sovereign immunity. The Federal Tort Claims Act, 28 U.S.C. § 1346, provides the requisite consent in certain circumstances. Because the examination of the district court's decision to grant the United States' motion to dismiss under Fed.R.Civ.P. 12(b)(1) is a matter of law, we review de novo. *Family & Children's Ctr., Inc. v. School City,* 13 F.3d 1052, 1057 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994).

Ms. Bailor alleges that the Bureau of Prisons negligently placed Holly at the Salvation Army, gave inadequate guidance to the Salvation Army for monitoring Holly, and failed to enforce existing rules concerning the notification of proper authorities. Ms. Bailor further claims that the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680, does not apply to this case.

The discretionary function exception of the Federal Tort Claims Act preserves government immunity from suits in which liability arises from

[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). In creating the discretionary function exception, "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). For this exception to apply, therefore, two requirements must be met: (1) the action complained of must involve an element of judgment or choice; and (2) the action must relate to considerations of public policy. *United States v. Gaubert,* 499 U.S. 315, 322–23, 111 S.Ct. 1267, 1273–74, 113 L.Ed.2d 335 (1991); *Berkovitz v. United States,* 486 U.S. 531, 536–37, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988). If it is determined that the actions of the Bureau of Prisons involved discretion, the discretionary function exception will serve to protect the government from suit, even if the Bureau of Prisons abused its discretion or was negligent in the performance of its discretionary functions. *Hylin v. United States,* 755 F.2d 551, 553 (7th Cir.1985).

We have examined with care the various directives of the Bureau of Prisons, contained in the record, that deal with the decision of federal prison officials to transfer an inmate to a halfway house. These documents support the government's position that the decision to make such a transfer is a discretionary one. As for the second prong of the discretionary function exception analysis, its requirements are unquestionably met. The Bureau of Prisons' approval of transfer of inmates to halfway houses is entwined with the social considerations of integrating prisoners into society. A pre-release program, like placement in a halfway house, also alleviates the cost of keeping inmates in pris-on. Thus, because the decision to place an inmate in a halfway house requires the exercise of discretion and because policy considerations are involved, the United States is entitled to the protection afforded by the discretionary function exception.

### 2. Respondeat Superior

In Ms. Bailor's final submission, she contends that the Bureau of Prisons should be held liable for the Salvation Army's negligence because the Salvation Army is tantamount to an "employee" of the Bureau of Prisons. The United States argues that it cannot be held liable for the acts of the Salvation Army because the Salvation Army is not a Bureau of Prisons agent, but rather only an independent contractor. The Federal Tort Claims Act permits the United States to be sued for injuries resulting from the negligent actions committed by any employee of the government, but expressly precludes liability for the acts of any contractor of the government. *See* 28 U.S.C. § 1346(b); 28 U.S.C. § 2671. The Supreme Court has stated that the determination of whether an entity should be classified as a contractor or employee depends upon the amount of governmental agency control of physical performance of the entity's day-to-day activities. *United States v. Orleans,* 425 U.S. 807, 815, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976); *Logue v. United States,* 412 U.S. 521, 527–28, 93 S.Ct. 2215, 2219–20, 37 L.Ed.2d 121 (1973); *see also Cannon v. United States,* 645 F.2d 1128, 1134–35 (D.C.Cir.1981).

A careful study of the Statement of Work between the Bureau of Prisons and the Salvation Army, R.101, Ex. B at 1, demonstrates that the Salvation Army has great latitude in selecting the means of implementing the guidelines set forth in the statement. The guidelines contained in the Statement of Work proffer "aid, advice, and oversight" to ensure "the safety of residents," but "the regulations do not convert the acts of [the Salvation Army] into federal governmental acts." *Orleans,* 425 U.S. at 816–18, 96 S.Ct. at 1976–78. The Salvation Army is clearly a contractor, not an employee of the United States.

## Conclusion

As a matter of law, we must affirm the district court. Nevertheless, we must note that the events described in this record raise serious questions about the moral responsibility of the government to protect its citizens. The tension between developing more effective means of converting a federal prisoner into a productive community member and protecting the rights of law-abiding citizens to be free from attacks by violent felons creates a difficult task that requires great wisdom and fortitude. However, when private citizens suffer the results of unsuccessful attempts to deal with this problem, private legislation for their relief would not, in appropriate cases, be an inappropriate response for a government that has as one of its main functions the security of the law-abiding citizen. Ms. Bailor, although not eligible for relief under laws of general applicability that we must administer, is free to address such a request to the political branches.

AFFIRMED.