BRISSY ABRAHAM, Plaintiff-Appellant, v. WAYSIDE CROSS RESCUE MISSION, Defendant-Appellee.

Second District No. 2—96—1142

Opinion filed July 18, 1997.

Robert G. Kleeman, of Kralovec, Jambois & Schwartz, of Chicago, for appellant.

Dana C. Crowley, of Lowder & Crowley, of Chicago, for appellee.

JUSTICE THOMAS delivered the opinion of the court:

Plaintiff, Brissy Abraham, appeals the entry of summary judgment for defendant, Wayside Cross Rescue Mission, in plaintiff's negligence action. The issue for review is whether defendant had a duty to plaintiff to supervise one of its residents and to report any unauthorized absences.

The complaint alleged that defendant operated an inpatient rehabilitation center and "halfway house" in Aurora. Plaintiff's estranged husband, Abraham Abraham, was violent and abusive and had been sentenced to the Du Page County jail for violating a juvenile court order of protection. On March 18, 1994, pursuant to a court order, Abraham was transferred from the jail and accepted as a resident at defendant's facility. Defendant allegedly knew or should have known of Abraham's history of and propensity for violence directed towards his family and plaintiff. On April 4, 1994, defendant permitted Abraham to leave the facility unsupervised. Abraham travelled to the family home in Elmhurst and stabbed plaintiff numerous times.

The complaint further alleged that defendant should have been aware that Abraham's prolonged, unauthorized absence was likely to enable him to inflict harm on others, specifically plaintiff. Defendant allegedly had a duty to monitor Abraham's comings and goings and to report any unexplained or unauthorized absences. Defendant breached this alleged duty by negligently supervising Abraham's activities; by failing to monitor his whereabouts when he was absent from the premises for extended periods; by failing to notify timely a law enforcement agency; and by allowing Abraham to absent himself freely from the premises so as to create a danger to others, including plaintiff.

Defendant moved for summary judgment, arguing that it had no duty to plaintiff. It submitted the affidavit of Rick Thomas, the chaplain at defendant's facility. Thomas averred that he oversaw Abraham's treatment while he was at the shelter. Abraham was enrolled pursuant to his own request. Defendant does not accept referrals from the court system, nor does it provide care pursuant to a court order. Defendant is privately funded and is not affiliated with any court system or governmental body. Abraham was not transferred from the Du Page County court pursuant to a court order. Defendant agreed only to provide Abraham rehabilitative assistance for alcoholism; it did not provide any psychological evaluation. While Abraham was at the shelter, he did not exhibit violent tendencies and made no threats of violence. Because defendant's program accepts only those who request to be there, Abraham was free to leave any time during his enrollment at defendant's facility.

Plaintiff responded with the discovery deposition of Evelyn Pharms, the Department of Children and Family Services (DCFS) caseworker assigned to the Abrahams. The department had been involved with the family since November 1992. Pharms testified that Abraham had a history of drug abuse and violence towards plaintiff.

He had threatened to physically harm the family "to the point where the police were involved." On March 4, 1994, a juvenile order of protection was entered prohibiting Abraham from having contact with plaintiff or their children. Abraham violated the order of protection and was sentenced to 30 days in jail. However, Abraham was allowed to be released from jail if he entered a halfway house for alcoholism treatment. A jail social worker gave Pharms and Abraham the names of facilities, including defendant. The criteria for an acceptable halfway house were that it be willing to inform the court about Abraham's progress, have an alcohol treatment program where he could go for Alcoholics Anonymous (AA), and provide housing.

Pharms further testified that, when she called defendant's facility, she spoke to George Patterson, who told her the length of the program and "that it was run like a dormitory and that their clients are allowed to go out on furloughs." Pharms' understanding of the furlough system was that Abraham would be given approval to go specific places at times authorized by DCFS and the court. However, leaving the premises for a short time within the community would not be considered a furlough. She also understood that Abraham would not be allowed to leave the premises without prior approval from his counselor at defendant's facility.

Pharms went to juvenile court and got an order to release Abraham to go to defendant's facility. Pharms took Abraham to the facility, where she met with Thomas. She informed him of the juvenile court's involvement, the concerns about Abraham's drinking, and that the court wanted him to be in an alcoholism treatment program. Pharms also discussed Abraham's domestic violence problems and police contacts and the order conditioning Abraham's release on enrollment in the halfway house. Pharms also stated that she told Thomas she needed to be contacted for, and DCFS needed to approve, furloughs because Abraham could not have contact with plaintiff. Between Abraham's entry into defendant's program and April 4, 1994, he was conforming to the program, was working, and denied that he was having any problems.

Pharms also testified that Abraham had a court date on April 4 and that someone at defendant's facility advised her that Abraham would be transported to the court hearing. Pharms admitted that she was aware of defendant's policy that clients were allowed free time in the evening until 9:30 p.m. This meant that Abraham was free to come and go during that time. She also admitted that, as defendant's was not a locked facility, she was aware that Abraham could walk away at any time.

Pharms related that, prior to the April 4 incident, defendant

informed her that there were no suspicions that Abraham was using alcohol nor did he smell of alcohol. According to Pharms, Abraham was perceived as a risk "primarily when he was drinking."

The trial court granted defendant summary judgment, finding that defendant did not have a duty to be responsible for Abraham's whereabouts. The court used the test set forth in *Reynolds v. National R.R. Passenger Corp.*, 216 Ill. App. 3d 334 (1991). The court also noted that Abraham did not make any threats against plaintiff while he was at defendant's facility. The court emphasized that, in considering the foreseeability of the injury and the magnitude of guarding against it, the prevailing public policies concerning alcoholism treatment militated against imposing a duty. In the absence of specific threats against a specific third party, imposing a duty on alcohol treatment centers and shelters would be unreasonable. As the court explained, "such a duty is inconsistent with the public policy [such] that treatment centers would close their doors if [the court] imposed such a policy and the good work that they do would become more difficult to obtain."

Plaintiff's motion to reconsider the entry of summary judgment was denied, and she timely appealed.

■ Summary judgment is proper when the pleadings, affidavits, and other documents on file, construed in favor of the nonmovant, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995). Summary judgment is a drastic means of resolving litigation and should be allowed only when the right of the moving party to judgment is clear and free from doubt. *Espinoza*, 165 Ill. 2d at 113. While a plaintiff need not prove her case at the summary judgment stage, she must come forward with some facts that would arguably entitle her to judgment. *Jones v. Minster*, 261 Ill. App. 3d 1056, 1059 (1994). We review the entry of summary judgment *de novo*. *In re Estate of Hoover*, 155 Ill. 2d 402, 411 (1993).

■ In a negligence action, the plaintiff must establish that the defendant owed the plaintiff a duty, breached that duty, and the breach proximately caused the injury. *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 194-95 (1995). The existence of a duty is a question of law that depends on whether the parties stand in such a relationship that the law imposes an obligation on the defendant to act reasonably to protect the plaintiff. *Gouge v. Central Illinois Public Service Co.*, 144 Ill. 2d 535, 542 (1991). In making the determination, generally, courts consider the foreseeability and the likelihood of the injury, the magnitude of the burden of guarding against it, and the

consequences of placing that burden on the defendant. *Gouge*, 144 Ill. 2d at 542. The court in *Reynolds*, on which the trial court relied, included an additional factor, " ' "the currently prevailing public policies and social attitudes of the community." ' " *Reynolds*, 216 Ill. App. 3d at 338. quoting *Eckhardt v. Kirts*, 179 Ill. App. 3d 863, 870 (1989), quoting *Leesley v. West*, 165 Ill. App. 3d 135, 141 (1988).

In *Reynolds*, an Amtrak employee, Robert Krabec, was voluntarily admitted to a hospital and assigned to the alcoholism treatment unit. During his course of treatment, Krabec eloped from the hospital and went to Union Station, where he had been employed as a security officer. Krabec entered the security office and firearms locker and then shot and killed a fellow employee at Union Station. The hospital and the doctors were unaware of Krabec's absence for several hours. Amtrak and Union Station sued the hospital and the doctors for contribution, alleging, among other things, that those defendants failed to control Krabec's behavior and activities. The trial court dismissed the third-party complaints, finding that they failed to allege a duty.

The appellate court set forth the following test to determine whether a duty arose under the circumstances:

> "(1) [T]he patient must make specific threat(s) of violence; (2) the threat(s) must be directed at a specific and identified victim; and (3) a direct physician-patient relationship between the doctor and the plaintiff or a 'special relationship' between the patient and the plaintiff [must exist]." *Reynolds*, 216 Ill. App. 3d at 338.

The court noted that there was no indication that Krabec made any specific threats towards the coworker while Krabec was a patient at the hospital. As such, the third-party plaintiffs could not prevail on the first two elements. *Reynolds*, 216 Ill. App. 3d at 338.

On the third element, Amtrak argued that there was a special relationship in the form of a voluntary custodian-protectee because Krabec was under inpatient care at the hospital. The hospital and its medical staff voluntarily provided care and treatment for Krabec. The court rejected Amtrak's argument, finding that the third-party defendants owed no duty to the coworker because he was "a remote unidentified, unknown third party." The court reasoned that it was not reasonably foreseeable that Krabec would shoot a coworker whom he never mentioned to any of the hospital staff. *Reynolds*, 216 Ill. App. 3d at 339.

Plaintiff asserts that *Reynolds* is distinguishable. We agree. Here there was an identified victim, and, unlike in *Reynolds*, the custodian was aware of Abraham's violent propensities. *Reynolds*'s analysis derives from the general rule that a person has no duty to prevent a

third party from harming the plaintiff unless there is a special relationship between the defendant and the third person or between the defendant and the plaintiff. See Restatement (Second) of Torts § 315 (1965) (Restatement). Plaintiff instead urges us to rely on section 319 of the Restatement, which provides:

> "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Restatement (Second) of Torts § 319 (1965).

Plaintiff contends that defendant, as the operator of a "halfway house," should be held liable for injuries to third parties caused by improper supervision of its "inmates." Plaintiff cites cases from other jurisdictions which she argues are similar to the present cause. These cases are distinguishable. First, the defendant in *Dudley v. Offender Aid & Restoration of Richmond, Inc.*, 241 Va. 270, 401 S.E.2d 878 (1991), operated a residential prerelease facility in which convicts were to become acclimated for eventual release from prison. The defendant had a contract with the Department of Corrections that required it to notify the Department whenever an inmate was absent without authorization for more than two hours. The court there found that the "custodial duties" of the defendant surpassed those of a parole officer and met the criterion of section 319 for "one who takes charge" of a person. *Dudley*, 241 Va. at 276, 401 S.E.2d at 882. Similarly, the defendants in *Doe v. United Social & Mental Health Services, Inc.*, 670 F. Supp. 1121 (D. Conn. 1987), operated a halfway house under a contract with the Department of Corrections (*Doe*, 670 F. Supp. at 1123 n.3), and they violated the state standards imposed by the Department of Corrections (*Doe*, 670 F. Supp. at 1133). The defendants also were aware that the inmate was potentially dangerous to others and in need of treatment.

Plaintiff asserts that defendant's facility is a "halfway house" because Abraham was allowed to reside there instead of serving time in jail and he had assigned daily duties, mandatory attendance at group sessions and AA support groups, and a 9:30 p.m. curfew. What plaintiff neglects to note is that there were no guards at the facility, it was not a locked facility, and the residents could leave whenever they chose to do so. Furthermore, defendant's facility did not have a contract with the Department of Corrections or the county jail and, in fact, did not accept referrals from the court system. The facts in the record show that defendant's facility was an alcohol treatment facility and shelter and was not a halfway house for paroled felons. Regardless of defendant's designation, we must determine whether Abraham was nevertheless under defendant's control.

In *Bailor v. Salvation Army*, 51 F.3d 678 (7th Cir. 1995), the United States Court of Appeals for the Seventh Circuit discussed section 319 of the Restatement in light of Indiana law. The court explained:

"[U]nder § 319, '[f]or the duty to exist there must therefore not only be an actual taking charge of the third person, there must also be a knowledge of the likelihood that he will cause bodily harm.' Further, *** the entity taking charge must possess 'the right to intervene or control the actions of a third person.' " *Bailor*, 51 F.3d at 682, quoting *Estate of Mathes v. Ireland*, 419 N.E.2d 782, 784 (Ind. App. 1981), and *Sports, Inc. v. Gilbert*, 431 N.E.2d 534, 538 (Ind. App. 1982).

The court there found that the Salvation Army did not take control of the inmate because he was under the custody of the Attorney General and the Bureau of Prisons; the Salvation Army's ability or right to control him was limited; it had minimal discretion and its personnel were not authorized to possess lethal weapons; they could not use physical force to restrain a resident; and the Salvation Army had limited disciplinary discretion. *Bailor*, 51 F.3d at 682-83. In addition, it could not detain a resident, as residents were free to leave, provided they signed a sign-out sheet. The facility could not be " 'locked down' " to prevent residents from leaving. Like defendant's facility here, the "residents could leave the facility at any time, subject only to the consequences that could be imposed by the courts or by the Bureau of Prisons." *Bailor*, 51 F.3d at 683.

■ Defendant's facility is similar to the Salvation Army in that it did not have disciplinary discretion, it did not have armed guards, it could not be locked down, the residents could not be restrained, and the residents could leave the facility at any time. We therefore conclude that defendant did not exert sufficient control over Abraham so as to create a duty.

■ Moreover, plaintiff cannot meet the section 319 standard, or the first factor of the *Reynolds* test, because the evidence does not establish that defendant knew Abraham was likely to cause bodily harm. Abraham made no threats while in treatment, and he was thought to be doing well. Indeed, he was viewed as a danger only when he was drinking. Because he was abstaining from alcohol, it was not reasonably foreseeable to defendant that Abraham would travel to Elmhurst and harm his wife.

■ Finally, we believe that the public policy concerns militate against imposing a duty on defendant. Defendant offers important rehabilitative services to alcoholics and homeless people in the community. Unlike a halfway house for inmates about to be released

from prison (see *Bailor*, 51 F.3d at 684), there is no concomitant interest in protecting the public here, because defendant's residents are not inmates serving out part of a sentence. We therefore conclude that the evidence established that defendant had no duty to plaintiff and the trial court properly granted defendant summary judgment.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

COLWELL and RATHJE, JJ., concur.