In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1063

JOHN LIPSEY, Individually and as father and next friend of J.L., a disabled minor,

*Plaintiff-Appellant*,

*v.*

UNITED STATES OF AMERICA, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:12-cv-02100-JES-EIL — **James E. Shadid**, *Chief Judge*.

ARGUED SEPTEMBER 19, 2017 — DECIDED JANUARY 4, 2018

Before WOOD, *Chief Judge*, and EASTERBROOK and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. In this appeal, John Lipsey seeks relief on behalf of his minor daughter J.L., for tragic injuries suffered by J.L. at birth. The district court granted summary

judgment to the defendants, and Lipsey appeals that determination.

The facts underlying the grant of summary judgment are set forth in detail in the district court opinion, and in relevant part are as follows. On June 8, 2009, a criminal complaint was filed against Wenona White in federal court alleging charges of federal bank fraud. At the time, White was pregnant with her tenth child. White was scheduled to self-surrender on July 6, 2009, but she failed to appear and was not located and taken into custody until September 10, 2009. On September 11, the district court judge in Hammond, Indiana ordered her remanded to the custody of the United States Marshals Service.

Because White was 35 weeks pregnant by the time she was apprehended, the Marshals Service faced the challenge of finding a detention facility that was able to meet her late-pregnancy healthcare needs. The Marshals Service arranged for her to be housed at the Jerome Combs Detention Center ("JCDC"), a Kankakee County facility which has an intergovernmental agreement with the Marshals Service. The JCDC had a full-time medical staff, and a relationship with an obstetrics practice to handle the obstetric needs of its population.

When White arrived at the JCDC on September 11, the JCDC intake officer obtained information from her and completed an intake form with her. That form indicated that her due date was October 18, her last medical exam was in August, and that she took prenatal vitamins. The intake officer also took her blood pressure, which was high at 161/86. No medical history was taken. White does not recall whether she told that intake officer of any problems with her ninth preg-

nancy, but she acknowledges that she did not inform the intake officer that with her ninth pregnancy, she had placenta previa. That ninth pregnancy had resulted in an emergency cesarean section at 34 weeks, but there is no evidence that such information was ever communicated to any of the defendants. White signed a HIPAA release authorizing the release of her hospital records from Provident Hospital, where she received her prenatal care earlier in her pregnancy. Ivette Charee Sangster, a nurse at the JCDC, testified that she sought such records and was told by the hospital that they had no records of White as a patient there, but other evidence indicated that when the same request was made by a doctor from St. Mary's Hospital after J.L.'s birth, the records were promptly sent.

Over the next 10 days, White had a number of contacts with the JCDC medical staff. A nurse saw White in her housing unit on September 12 and White reported that she was not having any problems with her pregnancy. On September 16, another JCDC nurse, Heather Gill, met with White in the JCDC clinic. According to Gill's notes, White reported that it was her tenth pregnancy and that she had regular checkups with an obstetrician in Indiana, and she denied having any problems with the pregnancy. Nonetheless, a logbook entry stated that White reported labor pains on September 16. Gill ordered prenatal vitamins for White and indicated that she would try to schedule an appointment with the obstetrician. White admits that she told a female nurse that she was not having any problems with her pregnancy.

That appointment with the obstetrician proved problematic, however. The obstetrician who routinely provided care to JCDC patients refused to take White as a patient that late in her

pregnancy. According to JCDC Chief of Corrections Michael Downey's report at a September 17 medical staff meeting, he contacted the Marshals Service to ask that White be transferred to a different facility where obstetrical care might prove more accessible, and was informed that it would be impossible to move White at that time. The Marshals Service employees deny having received that request, but we assume the facts in Lipsey's favor on summary judgment. In any event, Downey resolved to continue to seek a transfer, and in addition ordered an emergency delivery kit and close monitoring of White by the health care staff.

The next day, September 18, JCDC physician assistant Timothy Menard attempted to have White come to the health care unit. A log note written by Menard indicates that White refused to be seen and that she signed a refusal form indicating that she was informed of the risks to her health and the health of her pregnancy. She was informed that without weekly gynecological exams there was no way to determine cervical dilation or position of the fetus. White admits that she signed a refusal form.

On September 21, Gill wrote a log note indicating that an obstetrician at Westwood OB had called back and agreed to see White "next Tuesday." Before that could happen, however, on September 22, White awoke with abdominal and back pain and called for assistance at 5:10 a.m. The fire department received a dispatch at 5:13 a.m., the ambulance crew arrived at 5:22 a.m., and White arrived at St. Mary's Hospital in Kankakee at 5:52 a.m. The hospital staff took her medical history at that time and she denied having any complications during her pregnancy or any chronic medical problems. At 6:07 a.m., the

nurse was unable to find any fetal heart tones, and a bedside ultrasound a minute later revealed a very slow fetal heart rate. At 6:13 a.m., the doctor decided to perform an emergency cesarean section and J.L. was delivered at 6:33 a.m. During that cesarean section, it was discovered that White had suffered a complete abruption of the placenta which stopped the flow of oxygen to J.L. Although J.L. was not breathing when she was delivered, the doctors were able to resuscitate her and transported her to the neonatal intensive care unit at the University of Chicago Hospitals. Tragically, as a result of the oxygen deprivation, J.L. has severe, permanent physical and mental disabilities. The abruption that resulted in the oxygen deprivation likely occurred either in the ambulance or at the hospital, because J.L. would not have survived if it had occurred earlier than that.

Lipsey filed suit on behalf of his minor child, J.L., against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq., and against the "Kankakee Defendants"—consisting of: Kankakee County; Timothy Bukowski, Sheriff of Kankakee County; Michael Downey, Chief of Corrections; Heather Gill, R.N.; Timothy Menard, P.A.; Dr. Clyde Dayhoff, JCDC's medical co-director; and Ivette Charee Sangster, L.P.N.—alleging medical malpractice and pendent claims under the Family Expense Act and for willful and wanton conduct. Judge Baker granted the motion for summary judgment of the defendant United States, and a subsequent district court judge, Judge Shadid, granted summary judgment on behalf of the Kankakee Defendants on the remaining claims. Lipsey now appeals both decisions.

We turn first to the claims against the United States. The United States as sovereign is immune from suit unless it has consented to be sued. The FTCA provides a limited waiver of immunity and provides for a cause of action for tort claims "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment … ." 28 U.S.C. § 1346(b)(1)*; United States v. Orleans*, 425 U.S. 807, 813 (1976). It defines government employees under the Act as including officers and employees of any federal agency but excludes "any contractor with the United States." *Id.* at 813–14; 28 U.S.C. § 2671. In applying that independent contractor exception to the waiver of immunity, "[a] critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'" *Orleans*, 425 U.S. at 814, quoting *Logue v. United States*, 412 U.S. 521, 528 (1973).

The Supreme Court in *Logue* addressed a situation factually analogous to the present one. In *Logue*, the Court held that the employees of a county jail which contracted with the Federal Bureau of Prisons to house federal prisoners were not federal employees, and therefore the United States could not be liable for their torts. *Logue*, 412 U.S. at 532; *Orleans*, 425 U.S. at 814–15. Even though the county jail was required by the terms of the contract to comply with Bureau of Prisons rules and regulations prescribing standards of treatment and to allow inspections to ensure compliance, the United States was not authorized to physically supervise the jail employees or control the day-to-day operations, and therefore the county jail was an

independent contractor for purposes of the FTCA. *Logue*, 412 U.S. at 531–32.

That reasoning applies equally here. The Marshals Service maintained an intergovernmental agreement with the JCDC which required the JCDC to provide appropriate medical care, and the Marshals Service conducted inspections to ensure compliance but was removed from the day-to-day operations of the facility. In fact, the Marshals Service had conducted an inspection of the JCDC two weeks before White was placed there, and the JCDC was found fully compliant with the federal health standards mandated by that agreement. Lipsey has failed to argue that the contract in this case is distinguishable from *Logue* or that the JCDC should not be considered an independent contractor under the same reasoning. Accordingly, the United States cannot be held liable under the FTCA for the actions of the Kankakee Defendants, and liability must be premised solely on the actions of the federal employees.

The only actions that fall within that category are the decision by Jeffrey Goble, a supervisory deputy marshal, as to where to place White initially, and the subsequent refusal to transfer White from that facility at the request of Downey. As to those placement and transfer decisions, liability under the FTCA is impacted by the discretionary function exception, which shields the government from liability for "an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an

employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

The discretionary function exception is an affirmative defense to liability, and two requirements must be met under that exception. *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014). First, the act at issue must be discretionary rather than mandatory, in that it involves an element of judgment or choice. *Id*. Accordingly, if the act at issue "deviates from a course of action prescribed by federal statute, regulation or policy," the employee's acts are not discretionary and therefore are not immune from suit. *Id.*; *United States v. Gaubert*, 499 U.S. 315, 322 (1991). Second, in order to fall within the discretionary function exception, the government actions and decisions must be based on considerations of public policy. *Keller*, 771 F.3d at 1023.

The Marshals Service has a statutory duty to "provide for the safe-keeping of any person arrested … pending commitment to an institution," and it is authorized to fulfill that duty by placing prisoners in federal institutions or by contracting with state and local governments to house those prisoners. 18 U.S.C. §§ 4086, 4002. Those contracts with local facilities, called Intergovernmental Agreements (IGAs), ensure that minimum standards of confinement and services are provided, including requiring that detainees receive medically necessary health care services whether within the institution itself or at a remote location such as at a hospital. The JCDC, for instance, had a larger medical staff on site, and offered more extensive medical services, than other available facilities according to Goble. And it is undisputed that the JCDC officials had the authority to

send any inmate to the emergency room without approval from the Marshals Service.

The Marshals Service monitors compliance with those conditions through inspections that occur at least once a year. In choosing where to place a detainee, therefore, the Marshals Service chooses among federal institutions or those state or local facilities with which it has an IGA. But no provision, statutory or otherwise, mandates the specific facility in which to place an individual prisoner. The determination as to where to house a federal prisoner is precisely the sort of discretionary act that falls within the discretionary function exception. Although Lipsey points to the requirement to provide adequate medical care to inmates, that obligation is met in the IGA which imposes that obligation on the facilities and which is monitored through inspection. The decision at issue here is not the choice as to whether to provide medical care; it is the determination as to which—among the qualified facilities—is most appropriate for a particular inmate. That is quintessentially a discretionary decision. See *Bailor v. Salvation Army*, 51 F.3d 678, 685 (7th Cir. 1995) (decision to transfer an inmate to a halfway house falls within discretionary function exception because the decision is a discretionary one and involved considerations of public policy)

Moreover, the second prong of the discretionary function exception is met as well. Inherent in such placement and transfer decisions are considerations of public policy such as concerns with security, cost, overcrowding, medical care, and the suitability of each facility to meet the needs of the prisoner. See *Bailor*, 51 F.3d at 685 (decision to transfer inmates to halfway house involves policy considerations such as social

considerations of integrating prisoners into society and the costs of incarceration); see also *Meachum v. Fano*, 427 U.S. 215, 225 (1976) (in a different context, noting that the transfer of a prisoner is the type of discretionary action made for varied reasons and involving considerations of what would best serve institutional security or the safety and welfare of the inmate). In fact, Goble based the placement decision on one of those concerns, the availability of medical care for White's pregnancy. He chose the JCDC because, among the jails with which the Marshals Service had an IGA, he believed that it had the best medical facilities. The evidence of record indicates that his belief was not unfounded. The JCDC had a larger on-site medical staff including two doctors, a physician assistant, a registered nurse, a licensed practical nurse, and two on-call nurses. None of the available IGA facilities had an on-site obstetrician, but the JCDC had an ongoing relationship with off-site obstetricians to provide such services to its inmates. The record is clear that the placement decision rests on considerations of public policy such as the provision of adequate medical care. The same policy considerations inhere in any decision as to whether to transfer a prisoner. Accordingly, the district court properly determined that the actions in deciding to place White at JCDC and in retaining her there rather than transferring her at that late stage in her pregnancy fell within the discretionary function exception to the waiver of sovereign immunity in the FTCA. As to those actions the United States retains sovereign immunity, and the district court properly granted summary judgment to the United States on that ground.

We turn then to the district court's grant of summary judgment to the Kankakee Defendants, some of whom provided medical care ("the medical defendants") and some of whom did not ("the non-medical defendants"). Lipsey argued that all of the Kankakee defendants were negligent in the management, monitoring, care and treatment of White's pregnancy. The district court based its decision on § 4-105 of the Tort Immunity Act, which provides that "[n]either a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care." 745 ILCS 10/4-105. As the district court held, that provision establishes that as to injuries that resulted from the failure to furnish or obtain medical care for a prisoner in custody, a public employee is liable only if two criteria are met: first, that she knew based on her observation that immediate medical care was needed, and second, that the failure to take reasonable action to provide that medical care was willful and wanton. The district court determined that neither step was met here.

We look first at the medical defendants. The court held that there was no evidence that any of the medical providers at JCDC were aware from personal observation that White or her pregnancy were in danger or required immediate medical care prior to the morning of September 22, 2009. According to the court, "[t]he evidence … shows, at best, that Defendants were

aware that White was in her last trimester of pregnancy, had blood pressure of 161/86 on admission, repeatedly denied experiencing any problems or complications with her pregnancy, and made no request for medical attention until the morning of September 29, 2009."

At worst, up until that time the medical defendants may have been negligent in overlooking the significance of White's elevated blood pressure when she arrived at JCDC and her September 16 labor pains. But mere negligence is not enough. The district court held that Lipsey failed to establish that the medical defendants' failure to provide the necessary medical care was willful and wanton. At the first instance in which the need for immediate care was apparent, the morning of September 22, 2009, the medical providers immediately summoned such medical care, calling for paramedics within three minutes of being notified that White was in pain, with the result that the ambulance arrived at the JCDC only twelve minutes after they were first alerted to her condition. Accordingly, the court held that there was no evidence that the medical defendants willfully and wantonly failed to summon immediate care when needed.

After two pages of analysis applying § 4-105 of the Tort Immunity Act, the district court determined that the Kankakee Defendants were entitled to immunity under that provision. In one ensuing sentence, the court considered §§ 6-105 and 6-106 of the Tort Immunity Act, concluding that, "[g]iven this record, the Court also finds that they would be entitled to immunity under §§ 6-105 and 6-106, as there is no evidence establishing that they should have made a different diagnosis before White began having problems on September 22, 2009, or failed to

administer prescribed treatment." The court then held that the Kankakee Defendants were therefore entitled to summary judgment.

Although the district court based its decision of immunity on § 4-105 of the Tort Immunity Act, with only a passing nod to immunity under §§ 6-105 and 6-106 as well, the plaintiff failed to assert any argument concerning § 4-105. That statutory provision is not cited in the appellant's opening brief, nor is the willful and wanton standard discussed or applied. By failing to attack the basis of the district court's grant of summary judgment, the plaintiff has waived such argument on appeal. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012). But we note that as stated above, even if we were to consider that standard, the district court properly held that there is no genuine issue of fact as the evidence at best showed mere negligence not willful and wanton conduct as required to avoid immunity under § 4-105.

The district court also properly granted summary judgment as to the non-medical defendants, as to whom a negligence standard applies. The plaintiff argues that the non-medical defendants were negligent in failing to confirm the availability of necessary care before accepting the transfer, but the record does not support such a determination. At the time White was accepted into the JCDC, the non-medical defendants knew that that the JCDC had housed pregnant inmates in the past and had provided medical care to those inmates. They had no reason to believe they would be unable to provide that same care for White as well. To the extent that they had any personal involvement after that point, they were entitled to rely on the judgment of their medical staff thereafter and nothing indicates

that they failed to do so. Therefore, the district court properly granted summary judgment to the non-medical defendants as well.

In a case such as this one, with tragic injuries to a newborn, the weight of the situation is ever-present in our minds. But we are entrusted here to determine only whether the district court properly applied the law to the defendants who are before us in this case. We hold that the district court properly granted summary judgment.

Accordingly, the decision of the district court is AFFIRMED.